UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Arbitration under the<br>North American Free Trade Agreement<br>(NAFTA) between<br><br>INTERNATIONAL THUNDERBIRD<br>GAMING CORPORATION,<br><br>           Petitioner,<br><br>vs.<br><br>THE UNITED MEXICAN STATES,<br><br>           Respondent | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MOTION TO VACATE THE ARBITRAL AWARD ISSUED ON JANUARY 26, 2006 BY ARBITRAL TRIBUNAL CONSTITUTED UNDER CHAPTER ELEVEN OF THE NORTH AMERICAN FREE TRADE AGREEMENT.

Petitioner International Thunderbird Gaming Corporation hereby moves to vacate the Arbitral Award issued on January 26, 2006 by the Arbitral Tribunal constituted under Chapter Eleven of the North American Free Trade Agreement (hereinafter the "Award") , a true and correct copy of which is attached hereto.

The motion is made pursuant to Sections 10 and 12 of the Federal Arbitration Act, 9 United States Code Sections 10 and 12, and upon any and/or all the following grounds:

1.      The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy and/or of other misbehavior by which the rights of petitioner have been prejudiced [9 U.S.C. §10(3)]; and/or,

1

2.     The arbitrators acted in "manifest disregard of the law".

This motion is based on this motion, the memorandum of points and authorities filed, the

declarations and supporting evidence filed herewith, the papers and pleadings on file and to be filed

in this proceeding and upon such other and further evidence or argument as may be presented

hereafter and/or at any hearing upon this motion.

Pursuant to LCvR 7(f), Petitioner International Thunderbird Gaming Corporation requests

oral argument.

Respectfully submitted,

Date: April 24, 2006

Christopher W. Mahoney (D.C. Bar No. 394416)
Duane Morris LLP
1667 K Street, N.W.
Suite 700
Washington, D.C. 20006
Telephone: 202-776-7867
Facsimile: 202-776-7801

Date: April 24, 2006

James D. Crosby (Ca. Bar No. 110382)
Attorney at Law
13400 Sabre Springs Parkway, Suite 200
San Diego, California 92128
Telephone: (858) 486-0085
Facsimile:  (858) 486-2838

Attorneys for Petitioner International
Thunderbird Gaming Corporation.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Arbitration under the North American Free Trade Agreement (NAFTA) between | ) ) ) ) |
| INTERNATIONAL THUNDERBIRD GAMING CORPORATION, | ) ) ) |
| Petitioner, | ) Case No.: ) ) |
| vs. | ) ) |
| THE UNITED MEXICAN STATES, | ) ) |
| Respondent. | ) ) ) |
| _____ | ) ) |

<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE THE ARBITRAL AWARD ISSUED ON JANUARY 26, 2006 BY ARBITRAL TRIBUNAL CONSTITUTED UNDER CHAPTER ELEVEN OF THE NORTH AMERICAN FREE TRADE AGREEMENT.</u>

## Table of Contents

I.      FACTUAL SUMMARY.................................................................................... 1

II.     THE ARBITRAL AWARD............................................................................. 4

III.    APPLICABLE STATUTORY AND NON-STATUTORY GROUNDS
        FOR VACATING AN ARBITRATION AWARD........................................... 4

IV.     THE TRIBUNAL MAJORITY'S MISCONDUCT AND MANIFEST
        DISREGARD OF APPLICABLE LAW, STIPULATED FACTS AND
        ITS OWN FINDINGS AS TO THUNDERBIRD'S RELIANCE UPON
        THE"OFICIO"AND IT'S LEGITIMATE EXPECTATIONS ARISING
        THEREFROM REQUIRES VACATION OF THE AWARD UNDER
        THE NON-STATUTORY GROUND OF "MANIFEST DISREGARD
        OF LAW" AND SECTION 10(3) OF THE FEDERAL
        ARBITRATION ACT....................................................................................... 5

        A.      Introduction........................................................................................ 5

        B.      Factual Background............................................................................6

        C.      The Legal Significance of Thunderbird's Reliance upon the "*Oficio*"
                and its Legitimate Expectations arising therefrom.................................10

        D.      The Burden of Proof and the Burden of Producing Evidence................15

        E.      The Award should be vacated due to the Tribunal Majority's "Manifest
                Disregard of the Law".........................................................................18

                1.      The Tribunal Majority knew of the governing legal principle
                        concerning the allocation of burdens of proof and burdens of
                        producing evidence, yet refused to apply it and/or
                        ignored it altogether................................................................19

                2.      The governing legal principle concerning the allocation of
                        burdens of proof and burdens of producing evidence ignored
                        by the Tribunal Majority was well defined, explicit, and
                        clearly applicable to the case....................................................25

                3.      Thunderbird was severely  prejudiced by the Tribunal Majority's
                        "manifest disregard of law".....................................................26

F.   The Tribunal Majority's improper consideration of the "illegality" issue.............27

V.   THE TRIBUNAL'S MANIFEST DISREGARD OF APPLICABLE LAW
     AS TO ITS AWARD OF FEES AND COSTS DICTATES VACATION
     OF THE FEE AWARD......................................................................................................31

VI.  CONCLUSION.................................................................................................................35

<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
VACATE THE ARBITRAL AWARD ISSUED ON JANUARY 26, 2006 BY ARBITRAL
TRIBUNAL CONSTITUTED UNDER CHAPTER ELEVEN OF THE
NORTH AMERICAN FREE TRADE AGREEMENT.</u>

Plaintiff International Thunderbird Gaming Corporation hereby submits it's memorandum of points and authorities in support of its motion to vacate the Arbitral Award (hereinafter "Award") issued on January 26, 2006 by the Arbitral Tribunal constituted under Chapter Eleven of the North American Free Trade Agreement.

I.

FACTUAL SUMMARY.

In October, 2001, The United Mexican States ("Mexico") forcibly seized the investment enterprises of International Thunderbird Gaming Corporation ("Thunderbird"). At the same time, it provided favorable treatment to its own investors undertaking identical investment activities. Mexico reneged upon promises made to Thunderbird. Mexico arbitrarily and unjustifiably discriminated against a foreign investment. Mexico breached its treaty obligations under the North American Free Trade Agreement ("NAFTA"). Mexico destroyed Thunderbird investment enterprises worth tens of millions of dollars.

Thunderbird wished to undertake investment activities in Mexico. In good faith and seeking "certainty" as to the propriety of its proposed enterprise, Thunderbird made disclosure to Mexico of its intended business activities. Thunderbird sought and obtained from the highest levels of the Mexican government an official opinion (*"oficio"*) attesting to the propriety and legality of its intended operations and setting standards for continuing operations. In reliance upon that official opinion, Thunderbird and its investors formed a series of Mexican entities to open and operate gaming facilities where customers played "skill machines". Three facilities were opened. Others were in various stages of preparation. The facilities were highly successful.

1

After a change of government, Mexico reversed course and reneged upon its prior approval of Thunderbird's activities. Mexico embarked upon an aggressive course of action to shut down the skill machine operations and destroy Thunderbird's investment enterprises. Mexico succeeded in that effort. It forcibly seized, closed and sealed Thunderbird's skill machine facilities. At the same time it was seizing Thunderbird's skill machine operations, Mexico was allowing its own investors to operate identical skill machine facilities.

On March 21, 2003, Thunderbird initiated arbitration under Chapter Five of the NAFTA *(Award, 6)*.[1] Thunderbird asserted that Mexico:

- breached its obligations under **NAFTA Article 1102 ("National Treatment")** by failing to provide to the investments of an investor of another Party (Thunderbird of Canada) treatment no less favorable than it accords, in like circumstances, to investments of its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments.

- breached its obligation under **NAFTA Article 1105 ("Minimum Standard of Treatment")** by failing to accord to the investments of an investor of another Party (Thunderbird of Canada) treatment in accordance with international law, including fair and equitable treatment and full protection and security.

- breached its obligation under **NAFTA Article 1110 (Expropriation and Compensation)** by directly or indirectly expropriating investments of an investor of another Party (Thunderbird of Canada) in its territory in the absence of a public purpose, on a discriminatory basis, without due process of law and not in accordance with Article 1105(1), and without payment of compensation equivalent to the fair market value of the expropriated investments.

---

[1] References to "Award, #"  are to the Arbitral Award (Exhibit "A" to the Motion) and the paragraph number.

2

On March 14, 2003, the Arbitral Tribunal was empaneled consisting of Professor Albert Jan van den Berg ( appointed as President of the Tribunal), Professor Thomas W. Walde and Agustin Portal Arioas. *(Award, 10)* Professor Walde was selected by Thunderbird. Walde is a widely-acknowledged expert on international investment law, with decades of experience which include years working with the UN and his having established the Centre for Energy, Petroleum & Mineral Law & Policy at the University of Dundee in Scotland. Mr. Portal was selected by Mexico. His expertise is in Mexican administrative and environmental law. Professor Van den Berg was selected by the appointing authority. His background is in commercial arbitration.

In April, 2003, the Tribunal held its first session to address procedural matters and the sequence of the proceedings. *(Award, 11)* Thereafter, various filings and briefings were made by the parties and various procedural/discovery orders were issued by the Tribunal. *(Award, 12-25)*

On April 26 through 29, 2004, a hearing for oral argument and witness testimony took place in Washington D.C. *(Award, 26-28)* Thereafter, various post hearing filings and briefings were made by the parties. *(Award, 30-38)*

On January 26, 2006. The Tribunal issued its Award. A true and correct copy of the Award is Exhibit "A" to the Motion.[2] Tribunal Panel Member Thomas Walde issued a Separate Opinion which dissented from the Tribunal majority on a variety of points; most specifically, on the majority's analysis of Thunderbird's reliance upon an official opinion letter *("oficio")* issued by Mexico as to the propriety of Thunderbird's business operations *(Walde Separate Opinion, 59-101)* and upon the award of fees and costs in the absence of misconduct or a manifestly spurious claim. *(Walde Separate Opinion, 124-146)[3]* A copy of the Separate Opinion is Exhibit "B" to the Motion.

---

[2]Exhibits are attached to the Lodgment of Exhibits in support of the Motion filed herewith.

[3]Thunderbird concurs with the Separate Opinion on these issues and encourages the Court to review same. But, Thunderbird is not adopting, in whole, the Separate Opinion as the basis for this motion. Thunderbird would agree that a differing view of the case is not, in and of itself, necessarily grounds for vacating an award. Thunderbird is making a more basic, but related, argument with this motion - that the Tribunal disregarded and ignored well-established principles of law relating to burdens of proof and burdens of producing evidence in the consideration of these issues. Thunderbird asserts that the Tribunal Majority, in essence, "rigged the deck" against Thunderbird by failing to impose upon Mexico the burden to produce evidence to support its arguments made in defense.

II.

THE ARBITRAL AWARD.

In the Arbitral Award issued on January 26, 2006, the Arbitral Tribunal:

1.      Held that Mexico did not breach Articles 1102, 1105 or 1110 of the NAFTA;

2.      Dismissed Thunderbird's claims; and

3.      Awarded Mexico $1,226,549.38 in costs of legal representation and $126,313.02 in
        arbitration costs.

        *(Award, 73)*

III.

APPLICABLE STATUTORY AND NON-STATUTORY GROUNDS

FOR VACATING AN ARBITRATION AWARD.

Section 10 of the Federal Arbitration Act [9 U.S.C. §10] provides that an award may be
vacated upon, among others, the following ground:

(3)      Where the arbitrators were guilty of misconduct in refusing to postpone the hearing,
         upon sufficient cause shown, or in refusing to hear evidence pertinent and material
         to the controversy; or of any other misbehavior by which the rights of any party have
         been prejudiced.

In addition to the statutory grounds in the Federal Arbitration Act, arbitration awards may
also be vacated where the arbitrators acted in "manifest disregard of law". Apex Plumbing Supply,
Inc. v. U.S. Supply Company, Inc. 142 F.3d 188 (4th Cir. 1998); LaPrade v. Kidder, Peabody & Co.
Inc. 246 F.3d 702 (D.C.Cir. 2001); Alston v. UBS Financial Services, Inc. 2006 WL 20516 (D.D.C.
Jan. 2, 2006). Manifest disregard of the law means more than error or misunderstanding with respect
to the law. Thus, a party seeking to have an arbitration award vacated on this ground must at least
establish that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored
it altogether and (2) the law ignored by the arbitrators was well-defined, explicit, and clearly
applicable to the case. LaPrade, supra, 246 F.3d at 706.

4

IV.

THE TRIBUNAL MAJORITY'S MISCONDUCT AND MANIFEST DISREGARD OF

APPLICABLE LAW, STIPULATED FACTS AND ITS OWN FINDINGS AS TO

THUNDERBIRD'S RELIANCE UPON THE *"OFICIO"* AND IT'S LEGITIMATE

EXPECTATIONS ARISING THEREFROM REQUIRES VACATION OF THE AWARD

UNDER THE NON-STATUTORY GROUND OF "MANIFEST DISREGARD OF LAW"

AND SECTION 10(3) OF THE FEDERAL ARBITRATION ACT.

A.     Introduction.

At issue in this motion is the Tribunal Majority's misconduct in the treatment of the evidence surrounding two documents which were central to Thunderbird's case in arbitration:

(1)     The August 3, 2000 written request *("Solicitud")* to Mexico made by Thunderbird's subsidiary ("EDM") concerning Thunderbird's proposed gaming activities in Mexico. *(Exhibit C)*

(2)     The formal response to the Solicitud issued by Mexico on August 15, 2005 - the *"Oficio"*. *(Exhibit D)*

The Tribunal's cryptic analysis of these documents in the absence of any evidence provided by Mexico bearing upon their meaning or intent, or the imposition of any evidentiary burden on Mexico to produce such evidence, along with the Tribunal's refusal to allow depositions of the relevant Mexican witnesses and its improper consideration of issues of "illegality" in contravention to its own findings are the basis for this motion.

Also at issue in this motion is the Tribunal's award of almost $1.4 Million in fees and costs to Mexico in manifest disregard of established NAFTA jurisprudence.

Thunderbird well understands the great deference accorded to arbitration awards under the Federal Arbitration Act and otherwise. The case law is replete with descriptions of such deference and the limited nature of judicial review of arbitration awards. But, when an arbitration panel essentially "rigs the deck" against an arbitrating party, in utter disregard of applicable well-

established legal principles - *principles the panel itself acknowledges in its findings* - such that a party cannot get a full and fair determination of its claims on <u>all</u> of the facts, Thunderbird asserts that the reviewing court must step in to assist that party and remedy the severe prejudice arising from such misconduct.

B.   <u>Factual Background.</u>

Thunderbird's NAFTA claims arose from Mexico's seizure and destruction of its investment enterprises worth tens of millions of dollars in Mexico in late 2001. The details of Thunderbird's claims are set forth at pages 3 through 34 of its Particularized Statement of Claim ("PsoC") in the arbitration. *(Exhibit "E")* Thunderbird invites the Court's review of that factual recitation. Most significant to this motion are the events surrounding Mexico's issuance of, and Thunderbird's reliance on, an August 15, 2000 official opinion *(Oficio)* concerning the legality and propriety of Thunderbird's proposed and intended business operations.[4]

Beginning in late1999 and early 2000, Peter Watson, a lawyer from Minnesota, U.S.A., initiated discussions with Jack Mitchell, President and CEO of Thunderbird concerning potential gaming opportunities in Mexico. Watson had previously represented a U.S. investor in a Mexican gaming operation. Through that effort, he had gained considerable expertise with respect to investments in Mexico and its gaming laws. Mitchell also had significant  knowledge concerning gaming activities throughout Latin America. *[Exhibit "H" Watson, para. 3; Exhibit "I", Mitchell, paras.4-7][5]*

Mitchell and Watson looked at a number of investment possibilities, partnership arrangements and prospects for Thunderbird to establish gaming operations in Mexico. Thunderbird

---

[4]These events described in the PsoC *(Exhibit "E")* and in the following pages, as well as the nature and content of Thunderbird's contacts (through its Mexican subsidiary, EDM) with Mexican government officials, were largely admitted or uncontradicted by Mexico. Mexico presented no declaration or live testimony from any of the Mexican officials involved at the time. Mexico presented no percipient witness testimony on these issues, only 3-years-after-the-fact arguments.

[5]Direct testimony was presented in the arbitration by declaration. The referenced declarations were submitted in the arbitration as the direct testimony of the identified witnesses.

initially considered acquisition of a horse track facility and sports book operation in Nuevo Laredo. Thunderbird's lawyer in Mexico, Luis Ruiz de Velasco of Baker & McKenzie in Mexico City, reviewed proposed acquisition documents. Thunderbird ultimately decided not to pursue that investment. *[Exhibit "H",Watson para.5; Exhibit "I", Mitchell, paras. 8, 9, 10; Exhibit "Q", Velasco, paras. 1, 2, 3]*

Mitchell and Watson were contacted by Doug Oien and Ivy Ong ("Oien/Ong"). Oien/Ong were involved in various gaming activities inside and outside of Mexico. They represented to Watson and Mitchell that they had made an investment in a sports book and skill game facility operated by Jose Guardia in Juarez, Mexico. *[Exhibit "H", Watson para. 6; Exhibit "I",Mitchell, para. 8, 9, 10]* Mitchell and Watson met with Oien/Ong in the Nuevo Laredo to discuss potential skill machine operations in Mexico. Present at that meeting were two Mexican lawyers, Julio Aspe and Oscar Arroyo.

Thunderbird, through Watson and Mitchell, sought assistance from Thunderbird's Baker & McKenzie attorneys in Mexico. In April and May, 2000, Baker & McKenzie lawyer Luis Ruiz de Velasco, Mitchell, Watson and Mauricio Girault met several times with Aspe and Arroyo. Girault was a long-time friend of Watson. He became an investor in Thunderbird's skill machine enterprises and a director of Thunderbird. Aspe and Arroyo generally explained the process used by Guardia to defend against government actions with respect to his skill machine operations in Juarez and Mexico City. De Velasco analyzed the procedures utilized by Aspe and Arroyo; i.e., to simply open a skill machine facility and, if Gobernacion took action as it had with Guardia, defend by amparo proceedings. Velasco concluded that this confrontational approach would not provide Thunderbird with the certainty necessary to proceed with the significant investment. [Exhibit "H", Watson, paras. 9, 10, 11, 12; Exhibit "I", Mitchell, para. 12; Exhibit "Q", Velasco, paras. 3, 4]

In July 2000, Velasco, Girault, Aspe and Watson met in Mexico City. Aspe advised that he had several conversations with the Director of Juegeos y Sorteos[6] within Gobernacion. He stated that he had described to the Director what Thunderbird intended to do. Aspe indicated that he felt it might be possible to obtain an opinion letter from Gobernacion attesting to the legality of the skill machines. Thunderbird decided to request the official opinion from Gobernacion concerning the legality of its skill machines and proposed operations. If the response was favorable, Thunderbird would proceed with the opening and operation of its skill machine facilities in Mexico. *[Exhibit "H", Watson, paras. 11, 12; Exhibit "I",Mitchell, para. 12; Exhibit "Q",Velasco, para. 5]*

Over the next few weeks, Aspe and Arroyo continued to speak with their contacts in Gobernacion. **There were numerous contacts between the Thunderbird group and Gobernacion by and through Aspe and Arroyo. Those contacts concerned the nature and operation of the skill machines, Thunderbird's proposed operation and the text of a formal application to be presented to Gobernacion for consideration. Drafts of the proposed application were exchanged and discussed. Ultimately, Aspe indicated that Gobernacion was willing to consider and issue the opinion letter attesting to the legality of the skill machines.** *[Exhibit "H", Watson, para. 11, 12, 13, 14; Exhibit "I", Mitchell, para. 12; Exhibit "Q", Velasco, para. 5]*

On August 3, 2000, and after extensive discussions between the Thunderbird representatives and Gobernacion, EDM[7] presented a formal request, or *"solicitud"* to the Mexican government concerning the proposed skill machine operations. *[Exhibit "C"; Exhibit "Q",Velasco, para. 6; Exhibit "H", Watson, para. 15; Exhibit "J", Atallah, para. 16].* The application notified Mexico of EDM's intention to operate 2,000 machines at various locations in Mexico. The application clearly and directly stated its purpose:

---

[6]The Director of Juegos y Sortereos was, and is, the government representative within Gobernacion (Mexico's Department of Interior) with direct authority over all games in Mexico in which betting is involved, including games of chance ("Juegos de Azar"). *[Exhibit "Q", Velasco, para. 8.]*

[7]*EDM was Thunderbird's owned and controlled entity in Mexico.*

". . we are requesting an opinion from this Dirrecion General so the entity I represent has the certainty that the commercial exploitation of video game machines for games of skill and ability is legal." *[English translation] (Exhibit "C")*

The application was a direct request to the Director General of Gobernacion for an official opinion that the identified machines were not prohibited by Mexican law.

On August 15, 2000, Gobernacion issued the official letter. *[Exhibit "C" 18; Exhibit "Q", Velasco, para. 7; Exhibit "H", Watson, para. 16; Exhibit "J", Atallah, para. 17.]* The letter was signed by Rafael de Antunano Sandoval, Director de Juegos y Sorteos in the name of, and on behalf of, Mr. Sergio Orozco Arceves, Director General of Gobernacion. These are the officials in charge at the highest levels of the Mexican government with direct authority over all games in which betting is involved, including games of chance.*[Exhibit "Q", Velasco, para. 8]* Gobernacion's official letter stated that the machines identified in the August 3, 2000 *solicitud* were not subject to regulation.

> In this light, it is important to clarify that, if the machines that your representative exploits operate in the form and conditions stated by you, this governmental entity is not able to prohibit its use, in the understanding that the use of machines known as "coins-swallowers," "token-swallowers" or "slot machines," in which the principal factor of the operation is luck or gambling and not the user's ability of skillfulness as you stated, could constitute any of the hypothesis described under the Federal Law of Games and Sweepstakes, with the corresponding legal consequences that may be derived therefrom, under article 8 of such law

Based upon Gobernacion's official opinion letter, Thunderbird and its counsel concluded that Thunderbird could proceed with skill machine operations in Mexico. *[Exhibit "Q", Velasco, paras. 8, 9; Exhibit "H", Watson, para. 17; Exhibit "J", Atallah, paras. 17-20]* In reliance on Gobernacion's stated official opinion, Thunderbird moved forward with its plans to operate skill machine facilities in Mexico. *[Exhibit "J", Atallah, paras. 19-23].*

Mexico held general elections in July, 2000. Vicente Fox's administration came into office in December, 2000. J. Guadalupe Vargas Barrera ("Guadalupe Vargas") was appointed the new Director de Juegos y Sorteos. That position had been held by Antunano Sandoval. Sandoval had signed the August 15, 2000 official letter approving EDM's operation of skill machines. Through Guadalupe Vargas, Mexico began aggressive, and ultimately successful, efforts to destroy

9

Thunderbird's skill machine operations. *[Exhibit "Q", Velasco, para. 7, 15; Exhibit "H", Watson, para. 16].*

      C.     The Legal Significance of Thunderbird's Reliance upon the *"Oficio"*

              and its Legitimate Expectations arising therefrom.

Central to Thunderbird's case in the NAFTA arbitration were the *Solicitud* and the *Oficio*. Thunderbird argued that it petitioned the Mexican government for an official opinion by way of its *Solicitud* to secure "certainty" as to the legality and propriety of its intended operations in Mexico. Thunderbird further argued that Mexico's official response, the *Oficio*, provided them with the assurances they needed to proceed and continue with their investment activities in Mexico <u>and</u> provided a standard in accordance with which Thunderbird could proceed with its gaming activities without government regulation. The Tribunal correctly summarized Thunderbird's argument concerning its reliance upon the *Oficio* as follows:

> *Thunderbird contends that, seeking certainty as to the legality and propriety of its intended operations in Mexico, Thunderbird and EDM solicited the Mexican government for an official opinion. According to Thunderbird, SEGOB'S response to this Solicitud provided the EDMs with written assurance or "negative clearance" to operate the specific machines identified in the Solicitud; and defined as standard in accordance with which Thunderbird could operate skill machines without regulation by SEGOB, the standard being that the machines had to be ones in which the "principal factor" of operation was the user's skill and ability. Thunderbird does not assert that it had thus obtained a government permit or license to operate. Rather, SEGOB generated, according to Thunderbird, a legitimate expectation upon which the EDMs should have been able to rely reasonably. (Award,139)*

Mexico, for its part, argued that the *Oficio* did not create a legitimate expectation for Thunderbird and its operations. The Tribunal summarized Mexico's position on the *Oficio* as follows:

> *Mexico denies that the Oficio created a legitimate expectation for Thunderbird with respect to its investments in Mexico. According to Mexico, the Oficio was an advisory opinion, not an approval or permit, based on the information provided by EDM in the Solicitud, stating that if the machines operated by EDM were as described in the Solicitud, then they fell outside SEGOB's jurisdiction. Mexico asserts that it clearly and expressly made known to EDM the nature of the machines that were prohibited by law and that the Oficio was a clear warning that the operations EDM was conducting could be illegal. (Award,139)*

10

This factual dispute had extraordinary significance in the arbitration because of the legal principles of law enunciated by the Tribunal as applicable to this dispute. Thunderbird argued that detrimental reliance can form the basis of recovery under the NAFTA, particularly under the "Minimum Standard of Treatment" obligation in NAFTA article 1105.

> *Whether embodied in the equitable rule of estoppel or in the principle of good faith, the theory of detrimental reliance clearly stands as an element of the kind of "fair and equitable" treatment that is required of the NAFTA Parties under both Article 1105 and customary international law.*
>
> *(Exhibit "F", Thunderbird's Statement of Reply (SoR), page 57, lines 5 through line 8)*

The Tribunal agreed with Thunderbird and made the following express finding:

> **Having considered recent investment case law and the good faith principle of international customary law, the concept of "legitimate expectations" relates, within the context of the NAFTA framework, to a situation where a Contracting Party's conduct creates reasonable and justifiable expectations on the part of an investor (or investment) to act in reliance on said conduct, such that a failure by the NAFTA Party to honor those expectations could cause the investor (or investment) to suffer damages.** *(Award, 147)*

The significance of this applicable principle of law to Thunderbird's case in arbitration cannot overstated. If Thunderbird met its burden to prove its justifiable reliance on the *Oficio*, under the "detrimental reliance" principle found by the Tribunal to be applicable in the arbitration, it was a long way towards a significant award.   Mexico's subsequent shut-down and seizure of Thunderbird's gaming facilities were not in dispute.

Thunderbird presented substantial evidence of its detrimental reliance upon the *Oficio* with respect to its business operations in Mexico. That evidence is detailed at pages 72 through 78 of Thunderbird's PSoC *(Exhibit "E")* and at pages 6, 36 through 39, and 41 through 42 of its Statement of Reply *(Exhibit "F")*. For example, Peter Watson, Thunderbird's representative in Mexico testified as follows:

> *We also met in Mexico City with and selected Mr. Luis Ruiz de Velasco of Baker and McKenzie to be the corporate lawyer for Thunderbird In Mexico. De Velasco would also represent the entities to be formed in Mexico to operate the facilities and would help us analyze that state of Mexican law as to the legality of the skill machines. We also asked my friend and associate of many years, Mr. Mauricio Girault, to become formally involved in the project and to help us find our way. It was Girault who had originally identified the race track opportunity in Laredo and found Luis Ruiz de*

11

*Velasco.*

*In mid to late July 2000, Velasco, Girault, Aspe and I met at Girault's office in Mexico City. During that meeting, Aspe advised us that he had had several conversations with the Director of Juegos y Sorteos within Gobernacion. Aspe had told us all along that in spite of the litigation and conflict over Guardia's skill machines, he and Arroyo had maintained good relations with the Juegos y Sorteos. Aspe stated that he had disclosed to the Director of Juegos y Sorteos exactly what Thunderbird intended to do. Aspe stated that he felt it might be possible to secure an opinion letter from Juegos y Sorteos attesting to the legality of skill machines.*

*Velasco advised that proper procedure was to make a solicitation ("solicitud") requesting a legal opinion regarding the use of skill machines. He explained that under such circumstances, the government would be required to provide a written opinion letter of its position as to the proposed skill machine operations.*

*Over the next few weeks, Aspe and Arroyo continued to speak with their contacts in Gobernacion. Velasco drafted and suggested a pro forma opinion letter. Finally, we were advised by Aspe that Gobernacion was willing to issue such a letter. After conferring several times with Mitchell and Albert Atallah, General Counsel for Thunderbird, we decided to formally submit the solicitud.*

*Thereafter, Aspe, Arroyo and Velasco began extensive discussions with Gobernacion as to issuance of the opinion letter. Velasco prepared and on several occasions revised the letter opinion which was ultimately to be signed.*

*Ultimately, we submitted the formal solicitud. In that document, we identified the make, model and type of machines we intended to operate in Mexico. We clearly delineated what a skill machine was and outlined its characteristics. We believed and understood that Gobernacion knew and clearly understood what a skill machine was, especially in light of that fact it had just litigated the Guardia case involving the legality of his skill machines. In that case, the court had called mathematicians, statisticians and other experts and had ruled that skill machines did not violate the constitutional prohibition against games of chance.*

*When we received the final opinion letter back from Gobernacion, Luis Velasco authenticated the document, verified that there was a file in Gobernacion which contained this information, and advised us that the matter was completed and that we would, with this letter, be able to open as many skill machine parlours as we wanted. The letter was signed not just by Mr Antuniano, but also by Sergio Orozco Arceves, the Director of Gobernacion, under Francisco La Bastida. In a later private dinner meeting I had with Francisco La Bastida, he acknowledged that he was aware of this solicitud and the response. He stated that since there was already a successful skill operation in Mexico, and a precedential court case, the response was an appropriate opinion).*

*With this opinion letter, we felt assured that we could make a substantial investment in this type of operation in Mexico. We anticipated that we could open and operate at least six and as many as a dozen or more skill machine facilities around the country.*

*(Exhibit "H", Watson, paras 10 through 17)*

12

Thunderbird's general counsel, in charge of due diligence for the company, in his supplemental declaration filed in support of this statement of reply, testified as follows:

> *In the case of the Mexico investment, the company determined that due to uncertainty in the law the best course of action was to approach Gobernacion with complete transparency. The investors that Thunderbird solicited for this venture would accept nothing less than that approach to become silent partners in the venture. The company prepared itself to commence operations in Mexico but was firmly committed that if Gobernacion did not provide the assurance through its letter of August 15, 2000, the company would not have opened its doors for business. This decision to seek Gobernacion's approval was well thought out and very deliberate. Management understood the risk that if Goberncaion's response to our petition was negative, we would never have pursued the business opportunity in Mexico.*

*(Exhibit "L", Atallah, para.17)*

Thunderbird offered declarations from 15 investors in the Mexican operations. As an example, investor Frank Bennett testified as follows:

> *Included in documentation and discussion with ITGC concerning the proposed investment in the Mexico Skill Machine Operation was Thunderbird's commitment to seek approval of that type of operation from the Mexico government. I understood and relied on ITGC seeking formal approval of the proposed skill machine operations from the Mexican government in order for ITGC to be certain it would proceed with the investment and operation. I further understood that Mexico responded with a letter dated August 15, 2000. I reviewed that letter in considering the investment. I understood from the letter that Mexico considered the skill machines to be operated by Entertainmens De Mexico to be legal under Mexico Law and not subject to Gobernacion's regulations. I relied heavily upon the August 15, 2000 letter from the Mexican government in considering and agreeing to invest money in the Mexico Skill Machine Operation. But for this approval of the proposed operation from the Mexican government, I would not have invested in the proposed skill machine operations and ITGC would not have proceeded with the investment and the operation.*

*(Exhibit "K", Bennett, para.3)*

In addressing the issue of Thunderbird's reasonable reliance on Mexican assurances, it is important to understand the context within which Thunderbird initiated its investment activities in Mexico. While Mexican law purportedly prohibited games of chance, it did not, and still does not, prohibit other related activities. In Mexico, there were and still are bingo parlors, sports book operations where customers wager on sporting events and horse and dog racing operations with betting on race outcomes, jai lai with wagering, and various other gaming-related activities. There were and still are numerous skill machine operations at various locations in Mexico. *[Exhibit "H",*

13

*Watson, para. 4, 7, 57; Exhibit "Q",Velasco, para. 25]* Mexico did not dispute these facts. It is within this legal and factual context that Thunderbird approached the Mexican government to address its intended operation of skill machines. Seeking certainty as to the legality and propriety of its intended skill game operations, Thunderbird sought direction from the Mexican government. Thunderbird got that direction in the form of the August 15, 2000 *Oficio*.

Further, simply the fact that Thunderbird approached the Mexican government *in and of itself* strongly supported the conclusion that Thunderbird justifiably intended to rely upon the government's response. Thunderbird had much to lose in approaching the government. If the Mexican government had rejected Thunderbird's intended operations, Thunderbird could only have proceeded with the investments in open defiance of the government's determination, something it would and could not have done. Under such circumstances, Thunderbird would have been better off to simply open a gaming facility and wait to see if and how the government responded. Thunderbird *expressly rejected* that approach and opted to openly approach the government with its intended activities. Seeking Mexican government assurances as to the propriety of its intended operation was no idle act for Thunderbird. It was the act upon which it was to proceed with its investment activities in Mexico. Regrettably, it was the act which led to Thunderbird's and Thunderbird's investor's significant losses in Mexico.

In **defense**, Mexico alleged, three years after the fact, as follows:

*The claimant's arguments refer to the letter of the Secretary of the Interior ("SEGOB") dated 15th August 2000. The Tribunal will appreciate that, contrary to what is maintained by claimant, EDM, in its application presented to SEGOB on 3rd August 2000, offered a simplistic and inaccurate description of the operations which it was already undertaking and wished to expand, as well as of the machines which it described as of "ability and skill". EDM did not show the machines or operations manuals to SEGOB, nor did they request that SEGOB visit the establishment which was already operating this type of machine, nor offered evidence of any type together with the document requesting SEGOB's opinion. EDM's application to SEGOB is based on the simple statement of its legal representative as to the nature of the operations and of the machines in question.*

*Even a superficial reading of the letter from SEGOB, reveals that it not a license, permit to authorization to operate; it does not even contain the approval of the Secretary or for the proposed operations or the machines which they were trying to use, as Thunderbird is now claiming. Neither did SEGOB issue an opinion as to the*

14

> *nature or characteristics of the machines. Given the way in which EDM made the inquiry, SEGOB limited itself to responding that the machines operated in the way and terms described in the application, and did not therefore have the jurisdiction to prohibit them.*

*(Mexico Statement of Defense, paras. 6,7)*

Thus, **in defense**, Mexico placed directly at issue its contemporaneous-to-its-receipt understanding and interpretation, and the alleged inaccuracy and misleading content, of the *solicitud* and its contemporaneous-to-its-issuance intention and understanding of the *Oficio*. Further, these defenses were raised by Mexico against the backdrop of unchallenged, uncontradicted evidence that (1) the very language of the *solicitud* was actively negotiated between Thunderbird representatives and Mexican government officials, and proposed drafts were exchanged before its formal submission and (2) the *Oficio* was issued by officials at the highest levels of the Mexican government. (*Exhibit Watson "H", para. 11, 12, 13, 14; Exhibit "I",Mitchell, para. 12; Exhibit "Q", Velasco, paras. 5, 8)*

> D.     The Burden of Proof and the Burden of Producing Evidence.

The applicable **burden of proof and burden of producing evidence** as applied, or, more precisely, as ignored and disregarded, by the Tribunal Majority in the arbitration is central to this motion.

As to this issue, Thunderbird argued that it had the legal burden of proof on its claims under international law, but that the burden of producing evidence shifted to Mexico to provide refuting evidence upon a *prima facie* showing by Thunderbird. Thunderbird argued that Mexico also held the burden to produce evidence upon matters of defense. Thunderbird stated the following in its Post-Hearing Brief in response to the Tribunal's posed question: *"Which of the parties has the burden of proof for each of the issues mentioned below?"*

> *Claimant has the legal burden of proof upon its claims under the applicable rules of international law. Conversely, Respondent has the legal burden of proof on any affirmative defenses raised. Separate and distinct from these well established overall legal burdens is the burden of producing evidence which shifts upon a prima facie evidentiary showing. Respondent, in its SoD, and Canada, in its Article 1128 Submission, confuse the burden of proof with the separate burden of producing evidence."*

*A claimant responsible for meeting a legal burden of proof upon a claim must first produce evidence upon each element of its claim sufficient to establish a prima facie showing on that claim. If the claimant fails to make a prima facie evidentiary showing on each and all of the required elements of its claim, it fails upon that claim and the responding party has no burden to produce evidence. If the claimant makes a prima facie evidentiary showing on each and all of the required elements of its claim, the burden shifts to the responding party to produce evidence necessary to rebut the facts established by the claimant. For example, while it is the responsibility of Claimant to prove that it received less favorable treatment than a comparable investor under Article 1102, once Claimant has made its prima facie evidentiary showing of less favorable treatment, the burden shifts to Respondent to rebut that evidentiary showing and prove why claimant is wrong.*

*(Exhibit G, page 3)*

The Tribunal summarized Thunderbird's position on the burdens of proof and producing evidence

as follows:

*Thunderbird contends that it has the "legal burden of proof" upon its claims under the applicable rules of international law and that, conversely, Mexico has the legal burden of proof upon any affirmative defenses raised. According to Thunderbird, the "burden of producing evidence" shifts upon a sufficient evidentiary showing.*

*(Award, 92)*

Mexico's position on the burdens of proof and producing evidence was largely in agreement.

The Tribunal summarized Mexico's position as follows:

*Mexico refers to Article 24 of the UNCITRAL Rules and international case law, arguing that a party asserting a fact or a claim is responsible for providing proof of all the elements thereof, and that the burden of proof may shift to the other Party on the basis of prima facie evidence. (Award, 93)*

On the allocation of the burdens of proof and producing evidence at the arbitration, the

Tribunal, following well-established law, largely stipulated to by the parties, found as follows:

**The present arbitration is governed by the UNCITRAL Rules. Article 24(1) of the UNCITRAL Rules provides:**

**Each party shall have the burden of proving facts relied on to support his claim or defence.**

**The Tribunal notes that the parties do not seem to diverge on the principals governing the burden of proof. The Tribunal shall apply the well-established principle that the party alleging a violation of international law giving rise to international responsibility has the burden of proving it's assertion. If said party induces evidence that prima facie supports it's allegations, the burden of proof may be shifted to the other party, if the circumstances so justify.**

16

**It is this well-established principle of law, stipulated to by the parties and explicitly found by the Tribunal to be applicable to the arbitration, that the Tribunal Majority ignored and disregarded to the severe prejudice of Thunderbird.** Thunderbird asserts that the Tribunal knowingly ignored and disregarded this applicable principle of law in its cryptic analysis of Thunderbird's reliance on the *Oficio*. For example, the Tribunal Majority found Thunderbird's *solicitud* to be "inaccurate", "incomplete" and, in essence, misleading, giving rise to the implication that Mexico was in fact misled as to Thunderbird's actual intended operations. But, the Tribunal never imposed the burden upon Mexico to actually prove what the Tribunal implied - that the Mexican officials who *actually received, reviewed and considered* the *Solicitud* in fact *actually viewed it* as not a proper disclosure, inadequate or misleading. There was no evidence before the Tribunal, and no burden placed on Mexico to produce evidence that the Mexican officials who *actually received, reviewed and considered* that *Solicitud* and/or who *actually drafted, executed and issued the Oficio* did not know exactly what Thunderbird intended to do and did not in fact intend to give Thunderbird the "negative clearance" to proceed. Shockingly, the Tribunal Majority did not shift the burden of producing evidence to Mexico on this critical issue despite the facts that (1) the assertion that Mexico was misled by the *solicitud* was raised as matter of defense and/or (2) Thunderbird submitted substantial *prima facie* evidence of its reliance on the *Oficio*.

Thunderbird argued in the arbitration that the *Oficio* generated a legitimate expectation upon which it could and did justifiably rely for its gaming operations in Mexico. Rejecting Thunderbird's NAFTA claim, the Tribunal Majority held to the contrary:

> *The threshold for legitimate expectations may vary depending on the nature of the violation alleged under the NAFTA and the circumstances of the case. Whatever standard is applied in the present case, however - be it the broadest or the narrowest - the Tribunal does not find that the Oficio generated a legitimate expectation upon which EDM could reasonably rely in operating its machines in Mexico. (Award, 148).*

Thunderbird asserts that this finding was an inevitable, if not predetermined, conclusion given the Tribunal Majority's egregious failure to impose upon Mexico the burden of producing evidence as to the contemporaneous-with-its-issuance meaning and intent of the *Oficio* from the Mexican

officials who actually received, reviewed, and considered the *Solicitud* and then drafted, signed, and issued the Oficio.

In **defense** of Thunderbird's claim that it had justifiably relied upon the *Oficio*, Mexico asserted that it was confused and/or misled by the *Solicitud* - in response to which the *Oficio* was issued - and that the *Oficio* was not intended to be a "negative clearance" for Thunderbird's business operations <u>or</u> a standard for future operation of skill machines. Yet, Mexico did not produce, **nor was it given the burden to produce**, even a shred of evidence that the involved Mexican officials were, in fact, confused or misled by the Solicitud, or did not in fact intend the *Oficio* to be a "negative clearance" for Thunderbird's business operations <u>or</u> a standard for future operation of skill machines. To reach its desired, and perhaps pre-determined result, the Tribunal Majority manifestly disregarded and ignored well-established principles as to allocation of evidentiary burdens. In doing so, the Tribunal Majority doomed Thunderbird to failure from the outset. By failing to allocate to Mexico the burden to produce evidence upon its defenses, the Tribunal effectively and improperly imposed upon Thunderbird the burden of *proving the unprovable* - what non-witness Mexico officials thought and understood at the time they negotiated the terms of, received and considered the *Solicitud* <u>and</u> what non-witness Mexico officials meant and intended at the time of, and by way of, the *Oficio*.

     E.     <u>The Award should be vacated due to the Tribunal Majority's "Manifest Disregard of the Law".</u>

To modify or vacate an award for "manifest disregard of law", the court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. <u>LaPrade</u>, <u>supra</u>, 246 F.3d at 702. These two elements are clearly present in the Tribunal Majority's Award.

1.   The Tribunal Majority knew of the governing legal principle concerning the allocation of burdens of proof and burdens of producing evidence, yet refused to apply it and/or ignored it altogether.

Thunderbird contends that the Tribunal Majority knew of the governing legal principle concerning the allocation of burdens of proof and burdens of producing evidence, yet refused to apply it and/or ignored it altogether. That the Tribunal Majority **"knew of"** the governing legal principle concerning the allocation of burdens of proof and burdens of producing evidence is without serious dispute.

First, the parties briefed and, in essence, stipulated that the principle was to be applied in the case. The Tribunal Majority then issued a finding that the principle applied in the arbitration. *(Exhibit G, page 3;Award, 93).*

Second, the required shifting of burdens and the lack of evidence from Mexico were raised by Thunderbird throughout the arbitration. See Thunderbird's Statement of Reply *(Exhibit "F")* at page 1 and pages 6 through 7. Thunderbird addressed the absence of rebutting evidence in its opening statement at the hearing:

> *We believe that the critical elements of Thunderbird's claim are largely undisputed and, if disputed, are largely uncontradicted by evidence, and we would invite the scrutiny of the Tribunal, the close scrutiny of the Tribunal, the arguments made by Mexico, and the evidence offered in support of that, those arguments, and we would invite that same close scrutiny of our arguments.*
>
> *We believe that, on the evidence before the Tribunal, it's largely uncontradicted. The August 3 solicitud, the issuance of the August 15th letter, the opening of the three facilities, the efforts to open the other three facilities, the formation of the six EDM entities, the initial closure of Nuevo Laredo by Mr. Guadalupe Vargas, the opening of Nuevo Laredo per the agreement with Mexico, the July 10 hearing, and there is some dispute about what happened there, but that's largely uncontradicted as well; the issuance of the October 10 order, and the final closures of the EDM entities. We believe that these critical elements of our claim are largely undisputed and uncontradicted.*
>
> *Thunderbird has presented numerous--I mean, there are voluminous witness statements from essentially all of the parties involved; all the principal players on our side of the case have presented testimony to this Tribunal. We have provided complete documentation of our financial transactions as they related to the EDM entities, not only in summary form, but also in source form. I'm sure that the Tribunal has seen the production that we made in support of the submission. It's essentially*

all of our documentation on the financial aspects of these entities.

In contrast, Mexico presents witness testimony from essentially one participant, one percipient witness to the events at the time. That's Mr. Alcantara, and that testimony in both of his witness statements is general in nature and really distinct to a few issues. What we believe is rather glaring, and I think in large part is what this whole issue is about or this whole argument is about is the inability of the absence of any witness testimony or direct testimony from any of the principal players on Mexico's side. There is no testimony from any of the individuals involved in the EDM entities and Mexico's treatment of the EDM entities either from the prior Mexican administration or the present Mexican administration. There is no witness statement and no testimony from Mr. Antunano, the signatory to the August 15th letter. There is no witness testimony from Mr. Orozco Aceves, the government official over whom's signature and over whom's authority the August 15th letter was issued and signed. There is no witness testimony from Mr. Guadalupe Vargas, the principal protagonist on the other side of this case, and the individual who took the actions to shut down our facilities. There is no witness statement from Mr. Aguilar Coronado, the signatory to the October 10 order which caused the final seizure and closure of our facilities.

There is no witness statement or testimony from Cabeza de Vaca. There is no witness statement or testimony from Mr. La Bastida. We view this as a glaring lack of evidence, and in our view, in the absence of that evidence, substantial portions of Mexico's case are simply argument in the absence of supporting evidence, and this absence of testimony and this absence of evidence is particularly telling in the arguments surrounding the August 15th letter.

Mexico spends a lot of time and a lot of paper in their various pleadings asserting that Thunderbird and the EDM entities did not provide Mexico and the officials in the previous administration complete documentation, that they didn't provide manuals, that they didn't provide a variety of things. The implication, and in some places in their briefs, the argument is that the officials in the previous administration, Mr. Orozco Aceves and Mr. Antunano, were misled or that they did not understand what the EDM entities intended to do, and that they did not understand exactly how the skill machines worked at the time they issued the August 15th letter. That is an undercurrent of Mexico's defense on the entire detrimental reliance case.

But there is not one shred of evidence offered on that issue, offered directly on that issue, much less any witness statements from the government officials who created, drafted, negotiated, issued that letter. There is no evidence whatsoever, and again I invite the Tribunal's scrutiny of the evidence. There is no evidence whatsoever that Mexico was misled or misunderstood exactly what Thunderbird and the EDM entities intended to do.

There is no evidence that Mexico required more information that my clients didn't provide to them. There is no evidence--there is absolutely no evidence--that Mexico did not know exactly what we were doing and exactly how our skill machines worked. And that is a glaring lack of evidence in their case, and their case on the detrimental reliance portion of this is largely dancing around that and trying to raise implications about what these officials knew or understood, but there is not one shred of evidence that indicates their intent or their understanding at the time they

20

*issued the August 15th letter.*

*In our view, this is a gaping and fatal hole in Mexico's evidentiary defense on the detrimental reliance case.*

*[Hearing Transcript, pages 21 through 27]*

Thunderbird addressed the issue again in its Post-Hearing Brief *(Exhibit "G"):*

*In this arbitration, Mexico has failed to meet it's burden of producing evidence to rebut Thunderbird's prima facie showing of NAFTA Treaty violations. Thunderbird submitted substantial evidence in support of its NAFTA claims. Thunderbird submitted numerous detailed declarations from the individuals principally involved in all of the facts and circumstances of this case and thousands of pages of documents and records. It presented additional relevant testimony at the time of hearing. Thunderbird accordingly made its prima facie showing of NAFTA treaty violations. The burden then shifted to Mexico to rebut Thunderbird's evidentiary showing.*

*In its SoD and at the hearing, Mexico did not sustain that burden. Mexico presented little evidence refuting the principal factual elements of Thunderbird's claim. In fact, essentially all of the material factual elements of Thunderbird's case are either admitted or left un-rebutted by Mexico's defense. At pages 96 through 116 of the SoD, Mexico presented a paragraph-by-paragraph response to Thunderbird's Statement of Facts set forth at pages 3 through 34 of the PSoC. This response showed that little of the evidence presented by Thunderbird was actually rebutted by Mexico. Substantial portions of Thunderbird's Statement of Facts were admitted by Mexico. Other portions were generally denied but not contradicted with rebutting evidence. Mexico had the burden to produce evidence to rebut Thunderbird's prima facie evidentiary showing – not simply to issue unsubstantiated denials of that showing.*

*Thunderbird's claim centers largely around three events: (1) issuance of the August 15, 2001 opinion letter addressing EDM's proposed skill machine operations; (2) the February, 2001 closure of the Nuevo Laredo facility by Guadalupe Vargas; and, (3) the July 10, 2001 administrative hearing before Guadalupe Vargas leading to final closure all of the EDM facilities. Thunderbird's evidentiary showing on these events is largely admitted or left uncontradicted by Mexico.*

*As to facts surrounding the August 15, 2000 opinion letter, Mexico admits that the August 3, 2000 solicitud was a formal request to Mexico concerning proposed skill machine operations and that the solicitud notified Mexico of EDM's intention to operate 2000 machines at various locations in Mexico.[SoD, Pages 105-106.] Mexico admits that August 3, 2000 solicitude was a direct request to the Director General of Gobernacion for official opinion that the identified machines were not prohibited by Mexican law [SoD, Page 106]. Mexico admits that on August 15, 2000, Gobernacion issued the official opinion letter and that it was signed by the official in charge at the highest level of the Mexican government with direct authority over gaming [SoD, Page 106]. In its SoD and at the hearing, Mexico made a considerable effort to parse the words of that letter and reformulate its meaning. But Mexico does not dispute that the letter was solicited from the appropriate Mexican authorities; that it was solicited with respect to the proposed operation of identified*

*skill machines; that it was solicited and issued as an official opinion from SEGOB determining that the identified machines were not prohibited by Mexican law and setting forth an operating standard for Thunderbird skill machines; and that it was issued by the Mexican official with direct authority over such activities. Finally, Mexico does not dispute the text of the August 15, 2000 opinion letter offered as evidence.*

*In both its SoD and SoRej, and at the hearing, Mexico attempted to argue that the Mexican government officials who issued and/or signed the letter were confused or misled and therefore that the official letter could not be the basis for Thunderbird's detrimental reliance. But argument is all that Mexico provided on this point. Mexico did not meet its burden of producing evidence to support its claims. It did not produce one witness, nor any documentation, to prove that the officials who issued and/or signed the letter were, as a matter of fact, confused or misled by Thunderbird. Mexico's failure to produce evidence from its own government officials should be viewed as an admission that its assertions and arguments on this issue are made without any factual basis.*

*(Exhibit "G", pages 4 through 8)*

There is no dispute that the Tribunal Majority was well aware of the governing legal principle that required imposition of a burden upon Mexico to produce evidence as to its defense <u>and</u> to refute Thunderbird's prima facie showing, and that Thunderbird considered the absence of evidence from Mexico as fatal to Mexico's defenses.

It is also without serious dispute that the Tribunal Majority **"refused to apply or ignored altogether"** the governing legal principle concerning the allocation of burdens of proof and burdens of producing evidence. In fact, the Tribunal Majority acknowledged the absence of contemporaneous evidence in its specific findings upon the *"solicitud"* and the *"oficio"*, yet blatantly and, perhaps, purposely ignored the governing legal principle requiring imposition of the burden upon Mexico to provide just such contemporaneous evidence to support its defenses and to refute Thunderbird's *prima facie* showing. The Tribunal Majority prefaced its analysis and findings on the *"solicitud"* as follows:

*Given the lack of contemporaneous evidence on the record regarding the background of the Solicitud (such as witness evidence from Messrs. Aspe and Arroyo or from SEGOB officials in office when the Solicitud was submitted), the Tribunal cannot rely on presumptions or inferences, let alone speculation concerning that background.*

*(Award, 150)*

22

Despite this specific finding concerning the lack of contemporaneous evidence as to the *"solicitud"*, the Tribunal Majority did not impose upon Mexico the burden of producing evidence even though it was **Mexico** that asserted, **as a defense**, three years after the fact, that the *"solicitud"* was misleading and inaccurate to the SEGOB officials in office when it was negotiated and submitted. Where was the testimony, or documentation, from the relevant government official in office at the time to that effect? Why wasn't he produced at the hearing for cross-examination by Thunderbird? Why did the Tribunal relieve Mexico of its burden on these issues?

Likewise, as to the *"Oficio"*, the Tribunal Majority prefaced its analysis and findings as follows:

> *The Tribunal turns to the contents of the Oficio. Again, in the absence of any contemporaneous evidence surrounding the issuance of the "Oficio" (namely, the lack of witness testimony form SEGOB officials involved in the issuance of the Oficio, as well as that of Messrs. Aspe and Arroyo; see also ¶150 above), the Tribunal cannot rely on presumptions or inferences, let alone speculation, regarding its issuance and can only analyze the letter on its face value.*

*(Award, 160)*

Despite this specific finding concerning the lack of contemporaneous evidence as to the *"Oficio"*, the Tribunal Majority did not impose upon Mexico the burden of producing evidence even though it was **Mexico** that asserted, **as a defense**, three years after the fact, that the *"Oficio"* was not a "negative clearance" for Thunderbird (despite that fact this was what Thunderbird was told and understood it was receiving), was not intended to be relied upon and was not intended to set a standard for future operation of skill machines by Thunderbird. Where was the testimony, or documentation, from the relevant government official in office at the time to that effect? Why wasn't he produced at the hearing for cross-examination by Thunderbird? Why did the Tribunal relieve Mexico of its burden on these issues?

Thunderbird views this prefatory language to the Tribunal Majority's specific *"solicitud"* and *"Oficio"* findings as an effort by the writing majority panel members to avert attention from their utter disregard for the appropriate imposition of evidentiary burdens in the arbitration. As is evident in the above prefatory language, the Tribunal Majority was well aware that Mexico had not

23

met its burden and sought, in its Award, to "write around" that deficiency to reach its desired result. In fact, at paragraph 160 of the Award, the Tribunal Majority attempted to preemptively explain these matters away as follows:

> *The Tribunal turns to the contents of the Oficio. Again, in the absence of any contemporaneous evidence surrounding the issuance of the Oficio (namely, the lack of witness testimony from SEGOB officials involved in the issuance of the Oficio, as well as that of Messrs. Aspe and Arroyo; see also ¶150 above) the Tribunal cannot rely on presumptions of inferences, let alone speculation, regarding its issuance and can only analyze the letter on its face value.* ***In addition, it is not up to the Tribunal to determine how SEGOB should have interpreted or responded to the Solicitud, as by doing so, the Tribunal would interfere with issues of purely domestic law and the manner in which governments should resolve administrative matters (which vary from country to country). Rather, the Tribunal can only assess whether the contents of the Solicitud gave rise to legitimate expectations for Thunderbird within the context of Mexico's obligations under Chapter Eleven of the NAFTA.*** *(Award, 160)*

Frankly, and with all due respect to the Tribunal Majority, this is utter nonsense. The issue was not how Mexico *"should have interpreted or responded to the Solicitud"*; it was and is how the involved Mexico officials did, *in fact, at the time,* interpret and respond to the *solicitud.* Did they misunderstand what Thunderbird intended to do? Did they understand something different than what Thunderbird intended to convey? Did their negotiations with Thunderbird representatives concerning the *solicitud* and its proposed text lead them to understand or misunderstand some aspect of Thunderbird's intended operations? Did they understand the exact nature and operation of the machines to be operated by Thunderbird? Were they in fact misled? Where was the government official who would testify that he was misled? The Tribunal Majority placed no burden upon Mexico to produce evidence upon these critical matters of defense. **Simply put, Mexico could not successfully claim that Thunderbird misled them without providing relevant contemporaneous evidence that it was *in fact* misled. The Tribunal Majority allowed it to do so by not imposing upon Mexico the burden of producing evidence to that effect.[8]**

---

[8]*Professor Walde, in his Separate Opinion, agreed with this conclusion: "The consequence is that Mexico has not met the incumbent burden that there was deception of SEGOB by insufficient disclosure. It should have brought the SEGOB officials involved to the tribunal. Since it did not do so, the inference must be allowed that it considered that production of these key witnesses to the events would not have supported its argument of deception - nor its*

Rather, and put in its most simple terms, the Tribunal Majority read the *Solicitud* and determined by that reading that the document was, *in its view*, inaccurate, incomplete and, in essence, misleading. But, it did not require Mexico to present any evidence that it, in fact, at the time, viewed the document as inaccurate or incomplete or that it, in fact, at the time, was misled. The Tribunal Majority supplanted required evidence from Mexico with its own reading of, and conclusions about, the document. The fact that the Tribunal Majority viewed the *Solicitud* as inaccurate and incomplete is, frankly, meaningless and irrelevant, absent evidence from Mexico that it actually viewed the *Solicitud* as inaccurate, incomplete or misleading. By disregarding and ignoring the required allocation of burdens of proof and of producing evidence, the Tribunal Majority improperly supplanted its own inferences, suppositions, presumptions and, perhaps, pre-dispositions for supported evidentiary findings. Further, the finding above indicates the Tribunal Majority knew well that it was doing so and attempted to "write around" or pre-empt the issue in its award.

The harm done by the Tribunal Majority's disregard of the required imposition of a burden to produce evidence on Mexico was exacerbated by the Tribunal's refusal to allow Thunderbird to take depositions of the relevant Mexican witnesses. At the procedural hearing in April, 2003, Thunderbird sought the right to take depositions of relevant Mexican witnesses. The Tribunal rejected that request. (Exhibits "M" and "P"). Thus, not only did the Tribunal Majority refuse and fail to impose upon Mexico the burden to produce relevant witnesses and evidence upon matters raised in defense, it also precluded Thunderbird from going to Mexico to get its own testimony from such witnesses.

2.     <u>The governing legal principle concerning the allocation of burdens of proof and burdens of producing evidence ignored by the Tribunal Majority was well defined, explicit, and clearly applicable to the case.</u>

It is without any dispute that the governing legal principle concerning the allocation of burdens of proof and burdens of producing evidence was well-defined, explicit and clearly applicable

---

*argument about the meaning conveyed with the Oficio." (Separate Opinion, 75).*

to the arbitration. The Tribunal defined the principle itself and found it applicable to the case. *(Award, 94)*

In doing so, the Tribunal cited the following portions of the NAFTA case of Feldman v. Mexico:

> **"...various international tribunals, including the international court of justice, have generally and consistently accepted and applied this rule that the party who asserts a fact, whether the claimant or respondent, is responsible for providing proof thereof. Also it is a generally accepted canon of evidence in civil law, common law and, in fact, most jurisdictions, that the burden of proof rests upon the party, whether complaining or defending, who asserts the affirmative of a claim or defense.  If that party adduces evidences sufficient to raise a presumption that what is claimed is true, the burden then shifts to the other party, who will fail unless it adduces sufficient evidence to rebut the presumption."** [Emphasis added]

The requirements to establish "manifest disregard of law" are clearly met in this case. The arbitrators knew of the governing legal principle concerning the allocation of burdens of proof and burdens of producing evidence yet refused to apply it or ignored it altogether and (2) the governing legal principle ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.

    3.    Thunderbird was severely prejudiced by the Tribunal Majority's "manifest disregard of law".

Further, the Tribunal Majority's "manifest disregard of the law" severely prejudiced Thunderbird's case. The Tribunal Majority's negative finding as to Thunderbird's "legitimate expectations" arising from the "Oficio"  was an inevitable, if not predetermined, conclusion given the Tribunal Majority's egregious failure to impose upon Mexico the burden to produce evidence, *to support their own defenses*, as to the contemporaneous-with-its-issuance meaning and intent of the *Oficio* from the Mexican officials who actually received, reviewed, and considered the *Solicitud* and then drafted, signed, and issued the *Oficio*. The Tribunal effectively and improperly imposed upon Thunderbird the burden of affirmatively *proving the unprovable* - what non-witness Mexico officials thought and understood at the time they negotiated the terms of, received and considered the *Solicitud* and what non-witness Mexico officials meant and intended at the time of, and by way of, the *Oficio*. Given the gravity of Thunderbird's claims, if the involved Mexican officials would support the arguments made by Mexico three years after the fact in arbitration, Thunderbird would

have seen declarations and live testimony from those officials as evidence in the arbitration. The absence of such evidence clearly implies that the relevant Mexican witnesses were unwilling to provide such evidence and that, but for the Tribunal Majority's utter disregard of its obligation to impose upon Mexico the burden to produce evidence to support its defenses and to refute a *prima facie* showing, the result for Thunderbird at arbitration would have been dramatically different.

The Tribunal Majority, in its desire to reach a result, "rigged the deck" against Thunderbird such that it could not get a full and fair determination of its claims on <u>all</u> of the facts, Thunderbird asserts that this reviewing court must step in to assist Thunderbird under these circumstances and remedy the severe prejudice arising from the Tribunal Majority's misconduct.

F.     The Tribunal Majority's misconduct in considering the "illegality" issue.

Thunderbird also asserts the Tribunal Majority was guilty of misconduct in its consideration of issues of "illegality" where the parties had agreed and the Tribunal had explicitly held that such issues were not relevant and not before the Tribunal.

Thunderbird argued that Mexico was "free to regulate its country as it sees fit", but that Mexico had obligated itself under the NAFTA to compensate investors if the means by which it regulates is found to have violated the NAFTA. Thus, Thunderbird argued:

> *The Tribunal's role in these proceedings is clearly not to independently determine whether the EDM skill machines are in fact legal, or illegal, under Mexican law. Nor is it's role to simply defer to Mexico in its determination on that point. The Tribunal's role, as clearly articulated in Chapter 11, is to decide, based upon the facts before it, whether Mexico breached its NAFTA obligations in the manner in which it treated Thunderbird's investments. This includes determining (1) whether domestic investors have been treated better then Thunderbird's EDM investments; (2) whether Thunderbird's EDM investments have been accorded fair and equitable treatment; (3) whether Thunderbird reasonably relied to its detriment, on government assurances; and (4) whether compensation is owed by Mexico for expropriation of Thunderbird's EDM investments.*

*(Exhibit "F", Statement of Reply, page 5)*

Mexico in large part agreed, stating that it "considered it inappropriate for the Tribunal itself to be given the task of carrying out an analysis to determine whether the games operated by EDM constitute, under Mexican law, legal games of ability and skill or prohibitive games of chance or

27

gambling games. *(Exhibit "F", Statement of Reply, page 3)*

Addressing the "illegality" issue, the Tribunal found as follows:

> ***The Tribunal's role in the arbitration is not to determine whether the EDM machines were prohibited gambling equipment under the Ley Federal de Juegos, as acknowledged by both Parties.*** *It is not the Tribunal's function to act as a court of appeal or review in relation to the Mexican judicial system regarding the subject matter of the present claims, or in relation to the SEGOB administrative proceedings for that matter.*
>
> *Rather, the Tribunal shall examine whether the conduct of Mexico and the measures employed by SEGOB in relation to the EDM entities were consistent with Mexico's obligations under Chapter Eleven of the NAFTA.*
>
> *(Award, 125, 126)*

The Tribunal Majority also determined that it would not examine the nature and functionality

of Thunderbird's machines in light of its determination that the legality of the machines was not an

issue before the Tribunal.

> *The Tribunal agrees that the nature and functionality of the machines may be relevant in considering certain issues in this arbitration.* ***However, the Tribunal does not need to enter into a detailed technical discussion as to the precise nature and functionality of the machines, since both Parties acknowledge that it is not up to the Tribunal to determine the legality of the machines under the Ley Federal de Juegos y Sorteros.*** *(Award,  )*
>
> *(Award, 135)*

Having made these findings per the stipulation of the parties, the Tribunal Majority promptly

disregarded them and improperly addressed issues of illegality, <u>all to the detriment of Thunderbird</u>,

in support of its "analysis" of Thunderbird's detrimental reliance case. For example, in assessing

Thunderbird's asserted reliance upon the *Oficio*, the Tribunal noted that:

> *It cannot be disputed that Thunderbird knew when it chose to invest in Mexico that gambling was an illegal activity under Mexican law. By Thunderbird's own admission, it also knew that operators of similar machines (Guardia) had encountered legal resistance from SEGOB. Hence, Thunderbird must be deemed to have been aware of the potential risk of closure of its own gaming facilities and it should have exercised particular caution in pursuing its business venture in Mexico. At the time EDM requested an official opinion from SEGOB on the legality of its machines, EDM must also be deemed to have been aware that its machines involved some degree of luck, and that dollar bill acceptors coupled with winning tickets redeemable for cash could be reasonably viewed as elements of betting. Yet, EDM chose not to disclose those critical aspects in the Solicitud.*

28

If the legality or illegality of Thunderbird's operations in Mexico was not an issue before the court, of what relevance is this comment? The Tribunal Majority includes other gratuitous references to notions of illegality throughout its analysis of Thunderbird's "detrimental reliance" case. *(Award, 136, 150, 154, 162)* Yet, the purported "illegality" of the Thunderbird machines was, by the Tribunal Majority's own explicit findings, not before, and not to be considered by, the Tribunal. The Tribunal Majority violated its own findings, and the parties' stipulation, in an effort to bolster its analysis with the unfounded, unproven and false implication that Thunderbird's activities were in fact illegal and that Thunderbird knew it. What other conclusion can be drawn from the comment *"It cannot be disputed that Thunderbird knew when it chose to invest in Mexico that gambling was an illegal activity under Mexican law."*?

More troubling is the Tribunal Majority's disturbing insinuation that the *Oficio* was the product of an illegal bribe. At paragraph 150 of the Award, the Tribunal Majority stated as follows:

> *Given the lack of contemporaneous evidence on the record regarding the background of the Solicitud (such as witness evidence from Messrs. Aspe and Arroyo or from SEGOB officials in office when the Solicitud was submitted), the Tribunal cannot rely on presumptions or inferences, let alone speculation concerning that background. For instance, the Tribunal has noted the existence of a "success fee" arrangement between Thunderbird and Messrs. Aspe and Arroyo (who, according to Thunderbird, had numerous contacts with SEGOB officials in relation to Thunderbird's proposed operations). Thunderbird offered the two Mexican lawyers US$ 300,000 to secure a letter from SEGOB authorizing Thunderbird's gaming operations in Mexico (see correspondence at Exs. R-106, R-107& and R-121). According to Mr. Watson's draft letter of 10 August 2000, Thunderbird was prepared to pay Messrs. Aspe and Arroyo an additional US$ 700,000 if the letter was "granted exclusively for Thunderbird [ . . . ] and that no other such permission would be granted to other potential competing parties; otherwise, no additional fees would be owed." (Ex. R-121) In the absence of any evidence on the record in relation to the "success fee" arrangement and the nature of the dealings between Messrs. Aspe and Arroyo and SEGOB, these facts do not have a bearing on the Tribunal's analysis below. Under those circumstances, the Tribunal can only interpret the 3 August Solicitud on its face value.*

Thus, to support its analysis and Award, the Tribunal Majority insinuates an illegal bribe by Messrs Aspe and Arroyo. But, at the same time, it concedes that, due to the lack of evidence proving this implied charge, *"these facts do not have a bearing on the Tribunal's analysis below."* This is outrageous conduct on the part of a purported trier of fact. The claim there was an illegal bribe by

29

Apse and Arroyo involved in issuance of the *Oficio*, even if directly raised by Mexico, would clearly have been a matter of defense and Mexico submitted no evidence supporting such an assertion. Clearly, if such had been the case, Mexico presumably would have brought in the evidence and witnesses to prove that defense. It did not. Nevertheless, the Tribunal Majority included the *insinuation* of a bribe in its Award.[9]

At paragraphs 111 through 118 of his Separate Opinion, Professor Walde states that these insinuations, though unproven and not directly before the Tribunal, had a significant effect upon the Tribunal Majority's Award. Walde correctly states as follows:

> But what must ultimately decide this issue is that Mexico has the burden of proof - even if such burden can be discharged in an easier way by evidence of sufficient "red flag indicators". Mexico is responsible for the very formal conduct of its officials; there is the presumption of the validity, legitimacy and effectiveness of the Oficio of August 2000. Insinuating corruption but not submitting it for proper testing in legal combat is not an instrument that tribunals should pay any attention to, directly or indirectly, explicitly or implicitly. (Separate Opinion, 117)

Professor Walde, in his analysis of the Tribunal Majority's excessive fee award, again addressed the bribe insinuation at paragraph 147 of his Separate Opinion:

> The next reason I can think of as providing justification for this decision deviating significantly from standard investment arbitration is the suspicion raised by the payment of the success fee - i.e., that possibly the two lawyers who arranged for the comfort letter may have shared that fee with Mexican officials. If it were so, I would have no hesitation whatsoever to penalize the claimant for daring to use an investment treaty to protect the fruit of unethical behavior. As I have argued earlier, I would not require full proof, but rather enough corroborating indicators leading to a reversal of the burden of proof on claimant. But Mexico has not raised the suspicion openly, with substantiated argument and evidence and with a credible effort to bring its own officials who were involved in the comfort letter to the tribunal. In that situation, I consider that we have to disregard insinuations of bribery if they are not properly raised, substantiated and open to a fair hearing. Otherwise, and with this award, a signal is sent out to respondent governments to insinuate corruption as a standard defense technique; it is persuasive and effective, without having to stand up to the proper scrutiny of a full and proper litigation debate. The negative proof of non-corruption, is rarely possible. There is no foreign investment where a close interaction, mostly with use of local consultants, with the government can be avoided. The whiff of corruption can therefore be made to appear in virtually any foreign investment project.

---

[9]This reckless action was taken with absolute disregard for the consequences this insinuation, included in a formal and public arbitration award, might have on Thunderbird's ongoing business activities not involved in the arbitration proceedings.

The Tribunal Majority's inclusion of notions of "illegality" and the clear insinuation of an illegal bribe by Aspe and Arroyo in its Award, despite its own express findings that "illegality" was not an issue before the Tribunal and that insinuations of bribery had no bearing upon the analysis, was misbehavior prejudicing Thunderbird. That misconduct dictates vacation of the Award under Section 10(3) of the Federal Arbitration Act. Simply put, if notions of "illegality" and the clear insinuation of an illegal bribe were not matters before or to be considered by the Tribunal, per the parties stipulation or due to the absence of proof, why were these matters included in the Award? To say they were not considered and did not in part drive the Tribunal Majority's Award would deny the obvious.

V.

## THE TRIBUNAL'S MANIFEST DISREGARD OF APPLICABLE LAW AS TO ITS AWARD OF FEES AND COSTS DICTATES VACATION OF THE FEE AWARD.

The Tribunal's award of costs constitutes an unprecedented and unconscionable exercise of discretion under the applicable arbitral rules. Not only did it order Thunderbird to pay $378,939.06 of the $505,252.08 incurred by the parties for the costs of the arbitration, rather than apportioning those costs on an equal basis; the Tribunal also ordered Thunderbird to pay Mexico $1,126,549.38, representing ¾ of the legal costs claimed by Mexico. Arbitrator Walde did not agree with the Majority's costs award, effectively explaining how it was made in manifest disregard of the law applicable in NAFTA.

NAFTA Article 1131 stipulates that the Tribunal shall decide the issues in dispute in accordance with the NAFTA and applicable rules of international law. The Tribunal acknowledged, at page 31 of the Award, that the applicable rules of international law include: "judicial decisions and the teachings of the most highly qualified publicists of various nations, as a subsidiary source of international law" and "international conventions, whether general or particular, establishing rules expressly recognized by the contracting states."

NAFTA Article 1135 provides, in part, that "a tribunal may also award costs in accordance with the applicable arbitration rules." Articles 40(1) and 40(2) of the UNCITRAL Arbitration Rules,

31

which were designed, and are used, in both private commercial arbitration and investor-state arbitration, provide:

> 1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> 2. With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

As noted by Arbitrator Walde (*Separate Opinion*, para's. 129 to 131), the applicable rules of international law in a NAFTA investor-state arbitration include the jurisprudence of other NAFTA tribunals and the practice of investor-state arbitration generally. The applicable law in a NAFTA arbitration also includes binding interpretative statements issued by the North American Free Trade Commission under Article 1131(2), used when the NAFTA Parties agree upon definitively altering the course of such jurisprudence. Together, these mechanisms provide the context for what constitutes a "reasonable apportionment" of arbitration costs and legal fees under Article 40 of the UNCITRAL Arbitration Rules.

There have only been two NAFTA cases where costs were awarded against an unsuccessful claimant: *Waste Management* v. *Mexico* and *Methanex* v. *USA*. In *Waste Management*, the Tribunal unanimously ordered that the parties would bear their own legal costs, but ordered the claimant, a very large multinational corporation, to pay the arbitration costs of the case, which had been dismissed once and re-filed by the Claimant. In *Methanex*, the Claimant engaged in unprofessional conduct, by procuring evidence unlawfully and attempting to introduce it in violation of the obligation of good faith that governs all parties in an arbitration. *(Separate Opinion, para. 138)* Accordingly, the Tribunal rendered an award of legal costs against the Claimant. In all other NAFTA cases where the Claimant was unsuccessful, neither arbitration costs nor the costs of legal representation were awarded against the loser.

As confirmed by previous NAFTA practice, and in investor-state arbitration generally, the test for awarding or apportioning arbitration costs under Article 40(1) of the UNCITRAL Arbitration Rules is a determination of whether the losing party adopted a manifestly spurious or unmeritorious position. A tribunal's discretion lies in determining whether the application of this test should be tempered in light of the circumstances of the case. The Tribunal in *S.D. Myers* v. *Canada* confirmed and adopted this standard. *(Separate Opinion, para. 133)*

The Tribunal in *Azinnian* v. *Mexico* decided not to apply the standard because it determined that the NAFTA mechanism was still relatively untested; that the Claimants had brought the case efficiently and professionally; and because to do so would likely impact negatively upon the wrong claimant. *(Award, para. 217)* In contrast, as noted by Arbitrator Walde, the Tribunal in this case made no finding that Thunderbird's case was manifestly spurious or unmeritorious. *(Separate Opinion, para. 146)* Accordingly, there was no basis under applicable law for the Tribunal to apportion arbitration costs in favor of Mexico.

The practice of both NAFTA and other investment treaty tribunals indicates that it is exceedingly rare for a tribunal to award legal costs. *(Separate Opinion, para's. 127-128)* Such an award only takes place where exceptional circumstances warrant, such as party misconduct that breaches the duty of good faith. The *Methanex* case is the only one in which a NAFTA tribunal has made such a finding. No such findings were made by the Tribunal in this case. To the contrary, the Tribunal was positive about the professional conduct of the arbitration by the claimant. *(Award, para. 213; Separate Opinion, para. 143)* Accordingly, there was no basis under applicable law for the Tribunal to apportion costs of legal representation in favor of Mexico.

The Tribunal Majority manifestly disregarded the applicable law in rendering its costs award, implausibly concluding that the Tribunal was vested with "unfettered discretion" to award costs of *legal representation under Article 40(2) of the UNCITRAL Arbitration Rules. (Award, para. 213)* It further disregarded the applicable law in construing Article 40(1) of the UNCITRAL Arbitration Rules as if it permitted – with only one exception – that "the rate of success of a party" should be

applied by NAFTA tribunals hearing investor state disputes. To this effect, at paragraph 214 of its award the Tribunal Majority stated:

> It is also debated whether "the loser pays" (or "costs follow the event") rule should be applied in international investment arbitration. It is indeed true that in many cases, notwithstanding the fact that the investor is not the prevailing party, the investor is not condemned to pay the costs of the government. The Tribunal fails to grasp the rationale of this view, except in the case of an investor with limited financial resources where considerations of access to justice may play a role. Barring that, it appears to the Tribunal that the same rules should apply to international investment arbitration as apply in other international arbitration proceedings.

With this paragraph, the Tribunal Majority effectively admits that it exercised its discretion under Article 40 of the UNCITRAL Arbitration Rules in a manner that was in manifest disregard of the applicable law for a NAFTA tribunal. In a mere eleven paragraphs, the Tribunal rendered an unprecedented $1.25 million award against Thunderbird, failing to mention any of the "many cases" that established the practice it was meant to follow and failing to note any case that could be cited for authority to the contrary. The Tribunal Majority simply admitted how it "failed to grasp" the rationale of this applicable law – and so it chose instead to disregard it.

Moreover, even if one could overlook the Tribunal's manifest disregard of the applicable law in exercising its discretion under Article 40 of the UNCITRAL Arbitration Rules, the Tribunal failed to afford any opportunity to the Claimants to satisfy the test it arbitrarily selected for apportioning both the costs of the arbitration and the costs of legal representation: 'loser pays; unless the loser lacks financial resources to be able to pay.'

The Tribunal's test did not appear in the arguments of the parties. It did not appear in the transcripts of oral argument. Neither did the Tribunal offer the parties an opportunity to submit evidence or argument on their ability to satisfy a costs award when it solicited further submissions from them on costs, following the conclusion of hearings. Failure to afford a claimant the opportunity to demonstrate whether the circumstances of its case satisfy a legal test intended to be used by a tribunal to render its award violates fundamental principles of fairness contained within

34

both U.S. and international law. Such conduct grievously prejudices a claimant's interest in a fair hearing. Such conduct constitutes an effective refusal to hear evidence that is material and relevant to the dispute. Had Thunderbird understood just how important its ability to satisfy the kind of costs award contemplated by the Tribunal Majority could be – despite all of the applicable NAFTA law to the contrary – it certainly would have, and could have, led evidence on point.

Moreover, given its apparent concern for an unsuccessful claimant's ability to satisfy a costs award, it was utterly arbitrary and patently unreasonable for the Tribunal Majority to order Thunderbird to pay ¾ of Mexico's legal fees. As Arbitrator Walde noted, the Government of Mexico was represented by "a well integrated, highly competent, coordinated and seamlessly functioning government defense team consisting of over 7 or 8 Mexican and international lawyers, including from two expert law firms, hardened by many rounds of NAFTA Chapter XI litigation...." In contrast, he noted how this large legal team was "facing a small entrepreneurial company with (equally competent I should add) two outside single practitioner lawyers". *(Separate Opinion, para. 142)*

Such a contrast of legal resources brought to bear on the arbitration was enough to concern Arbitrator Walde about whether the Tribunal's costs award would foreclose "access to this type of justice for smaller companies". *(Separate Opinion, para. 142)* Not only did the Tribunal Majority not even consider how or whether Thunderbird might satisfy an 'access to justice' exception to its arbitrary 'loser pays' rule for both types of costs; it did not even consider whether awarding ¾ of the costs of Mexico's lavish legal team (in contrast to that which Thunderbird could muster) was in keeping with the principles of equity or access to justice.

In conclusion, the record clearly demonstrates that the Tribunal Majority demonstrated a manifest disregard for the applicable NAFTA law in exercising its discretion under Article 40 of the UNCITRAL Arbitration Rules. Not only did the Tribunal admit its 'failure to grasp' the applicable law, in favor of its own idiosyncratic test; it would not even seek evidence from the parties in order to be able to apply it.

## VI.

### CONCLUSION

Thunderbird respectfully requests that, for the reasons stated above, the Court vacate the Award and remand the matter for further arbitration proceedings before a newly-constituted arbitration panel, or, in the alternative, vacate the fee award on the separately stated grounds.

Respectfully submitted,

Date: April 24, 2006

Christopher W. Mahoney (D.C. Bar No. 394416)
Duane Morris LLP
1667 K Street, N.W.
Suite 700
Washington, D.C. 20006
Telephone: 202-776-7867
Facsimile: 202-776-7801

Date: April 24, 2006

James D. Crosby (Ca. State Bar No. 110383)
Attorney at Law
13400 Sabre Springs Parkway, Suite 200
San Diego, California 92128
Telephone: (858) 486-0085
Facsimile: (858) 486-2838

Attorneys for Petitioner International
Thunderbird Gaming Corporation.

36