## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| In the Matter of the Arbitration under the North American Free Trade Agreement (NAFTA) between | ) ) ) ) ) |
| INTERNATIONAL THUNDERBIRD GAMING CORPORATION, | ) ) ) |
| Petitioner, | ) ) Case No.: 1:06-cv-000748 HHK |
| vs. | ) ) |
| THE UNITED MEXICAN STATES, Represented by the Secretaria de Economía Alfonso Reyes No. 30 Col. Condesa 06179 Mexico D.F. Mexico | ) ) ) ) ) ) ) |
| Respondent. | ) ) ) |

## CROSS-MOTION FOR CONFIRMATION,
## RECOGNITION AND ENFORCEMENT OF ARBITRAL AWARD

Respondent United Mexican States hereby cross-moves for confirmation, recognition and enforcement of an arbitral award pursuant to the Federal Arbitration Act, 9 U.S.C. § 9, and Article IV of the Convention on Recognition and Enforcement of Foreign Arbitral Awards, incorporated into U.S. law by 9 U.S.C. § 201 et seq. (the "Convention"). The arbitral award was issued by an arbitral tribunal established under Chapter Eleven, Section B of the North American Free Trade Agreement and the UNCITRAL Arbitration Rules on January 26, 2006 and became final on that date.

The basis for this Cross-Motion is set forth in the accompanying Memorandum of Points and Authorities.  A proposed Order, as well as a declaration with supporting documentation, have also been filed in support of this Cross-Motion.


Dated:  July 7, 2006

                            PILLSBURY WINTHROP SHAW PITTMAN LLP


                            By:     /s/ Stephan E. Becker
                                    Stephan E. Becker (D.C. Bar No. 366676)
                                    Anne E. Langford (D.C. Bar No. 492271)

                                    2300 N Street, N.W.
                                    Washington, D.C.  20037
                                    (202) 663-8000

                                    Counsel for United Mexican States

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| In the Matter of the Arbitration under the<br>North American Free Trade Agreement<br>(NAFTA) between<br><br>INTERNATIONAL THUNDERBIRD<br>GAMING CORPORATION,<br><br>       Petitioner,<br><br>  vs.<br><br>THE UNITED MEXICAN STATES,<br>Represented by the Secretaria de Economía<br>Alfonso Reyes No. 30<br>Col. Condesa<br>06179 Mexico D.F.<br>Mexico<br><br>       Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: 1:06-cv-000748 HHK |

## MEMORANDUM OF POINTS AND AUTHORITIES OF THE GOVERNMENT OF MEXICO IN OPPOSITION TO MOTION TO VACATE AND IN SUPPORT OF CROSS-MOTION FOR CONFIRMATION, RECOGNITION AND ENFORCEMENT

Stephan E. Becker (D.C. Bar No. 366676)
Anne E. Langford (D.C. Bar No. 492271)
PILLSBURY WINTHROP SHAW PITTMAN LLP
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000

Counsel for United Mexican States

## TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................... 1

JURISDICTION .................................................................................................... 1

FACTS .................................................................................................................. 2

I.      THE AGREEMENT TO ARBITRATE ............................................................. 2

II.     THE ADMINISTRATION OF THE ARBITRATION ....................................... 5

III.    THE ISSUES IN DISPUTE IN THE ARBITRATION ...................................... 6

IV.     THE AWARD ................................................................................................. 11

ARGUMENT ........................................................................................................ 14

I.      THUNDERBIRD HAS NOT MET ITS BURDEN OF DEMONSTRATING
        THAT THE AWARD SHOULD BE VACATED .......................................... 14

        A.   The Tribunal Properly Rendered Its Factual Findings On The *Oficio* .......................... 15

        B.   There Was No Arbitral Misconduct At All, Let Alone Misconduct Within the
             Meaning of Section 10(3) .............................................................................. 18

             1.   The Tribunal Did Not Rule That the Machines Were Illegal Under Mexican
                  Law ....................................................................................................... 18

             2.   The Tribunal Did Not Make Any Findings on the Success Fee Arrangement ........ 19

        C.   The Award of Costs Was Based On Established Law And Practice ............................. 21

II.     THE AWARD SHOULD BE RECOGNIZED AND CONFIRMED ............................... 24

CONCLUSION ..................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Alson v. UBS Fin. Servs., Inc., Civ. A. No. 04-01798 (HHK), 2006 U.S. Dist. LEXIS 656
    (D.D.C. Jan. 2, 2006) ...............................................................................................14

DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818 (2d Cir. 1997)............................14

Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383 (2d Cir. 2003)..............14

Ford v. Hamilton Invs., Inc., 29 F.3d 255 (6th Cir. 1994) ................................................1

Garrett v. Merrill Lunch, Pierce, Fenner & Smith, Inc., 7 F.3d 882 (9th Cir. 1993) .......................1

Harry Hoffman Printing, Inc. v. Graphic Commc'ns, 912 F.2d 608 (2d Cir. 1990).........................1

Int'l Shipping Co. v. Hydra Offshore, Inc., 875 F.2d 388 (2d Cir. 1989)....................................1-2

Kanuth v. Prescott, Ball & Turben, Inc., 949 F.2d 1175 (D.C. Cir. 1991) ......................................14

*LaPrade v. Kidder, Peabody & Co., 246 F.3d 702 (D.C. Cir. 2001)..............................................14

LaPrade v. Kidder, Peabody & Co., 94 F. Supp. 2d 2 (D.D.C. 2000) ............................................14

Methanex v. United States, UNCITRAL Rules (Aug. 3, 2005), *available at*
    http://www.state.gov/documents/organizations/51052.pdf...............................................22

Pope & Talbot v. Canada, UNCITRAL Rules (Nov. 26, 2000), *available at*
    http://www.dfait-maeci.gc.ca/tna-nac/documents/CostsAward26Nov02.pdf..........................22

Pope & Talbot v. Canada, UNCITRAL Rules (Sept. 27, 2000), *available at*
    http://www.dfait-maeci.gc.ca/tna-nac/documents/pubdoc9.pdf ............................................22

SD Meyers v. Canada, UNCITRAL Rules (Dec. 30, 2002), *available at*
    http://www.dfait-maeci.gc.ca/tna-nac/documents
    /MyersFinalAward-Final-30-12-02.pdf ............................................................................ 22-23

Teamsters v. Local Union No. 61 v. UPS, 272 F.3d 600 (D.C. Cir. 2001)....................................15

Waste Management v. United Mexican States, Case No. ARB(AF)/00/3, ICSID Additional
    Facility Rules (May 26, 2000), *available at*
    http://www.worldbank.org/icsid/cases/waste_award.pdf.......................................................22

**Statutes and Rules**

9 U.S.C. § 9 ................................................................................................ *passim*

9 U.S.C. § 201 et seq. ("Federal Arbiration Act") ............................................... *passim*

28 U.S.C. § 1330 ............................................................................................ *passim*

**Legislative Authorities**

House Doc. 103-159, 103d Cong., 1st session (1993) ("NAFTA")........................................ *passim*

**Miscellaneous Authorities**

Alan Redfern, et al., Law and Practice of International
    Commercial Arbitration Ch. 11 (4th ed. 2004) ...................................................3, 23

Final Award No. 2795 (ICC 1977), *reprinted in* 4 Y.B. Com. Arb. 210 (1979) ...........................23

Final Award No. 5649 (1987), *reprinted in* 14 Y.B. Com. Arb. 174 (1989) .................................23

UNCITRAL Arbitration Rules, *available at* http://www.uncitral.org/uncitral_texts/arbitration/
    1976Arbitration_rules.html...............................................................................................4

ICSID website, *available at* http://www.worldbank.org/icsid/ .......................................................5

Organization for Economic Cooperation and Development, "Fair and Equitable
    Treatment Standard in International Investment Law" (Sept. 2004),
    *available at* http://www.oecd.org/dataoecd/22/53/33776498.pdf...............................................7

* Cases marked with an asterisk denote those authorities chiefly relied upon.

# INTRODUCTION

This Memorandum is submitted in support of both the Government of Mexico's Opposition to Motion to Vacate and its Cross-Motion for Confirmation, Recognition and Enforcement.

International Thunderbird Gaming Corporation ("Thunderbird") did not file a Complaint or a Petition, but rather commenced this proceeding by filing a Motion to Vacate ("Thunderbird's Motion") on April 24, 2006. Pursuant to a consent agreement between the parties, the Court granted Mexico's request for an extension for its response until July 7, 2006.

This memorandum is accompanied by the Declaration of Stephan E. Becker ("Becker Declaration"), including supporting documentation, and a proposed Order.

# JURISDICTION

Thunderbird's Motion did not identify the basis on which it is asserting that this Court has subject matter and personal jurisdiction. These issues are addressed below.

With regard to subject matter jurisdiction, Thunderbird simply checked off the box for Federal Question jurisdiction on the Civil Cover Sheet that accompanied its filing. The Federal Arbitration Act (9 U.S.C. §201 et seq.), however, does not confer Federal Question jurisdiction. Ford v. Hamilton Invs., Inc., 29 F.3d 255 (6th Cir. 1994); Garrett v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 882 (9th Cir. 1993); Harry Hoffman Printing, Inc. v. Graphic Commc'ns, 912 F.2d 608 (2d Cir. 1990). Diversity jurisdiction also does not exist, as Thunderbird is a Canadian corporation and Mexico is a foreign sovereign. The fact that Thunderbird may be headquartered in California is irrelevant, as there must be complete

diversity on both sides of the case.  Int'l Shipping Co. v. Hydra Offshore, Inc., 875 F.2d 388 (2d Cir. 1989).

Nonetheless, although apparently unknown to Thunderbird, there is a possibility to base subject matter jurisdiction on 28 U.S.C. § 1330 ("Actions against foreign states").  Because the Government of Mexico ("Mexico") wishes to have the award confirmed as soon as possible, and with the goal of avoiding wasting resources of the Court and the parties on this issue, Mexico accepts that subject matter jurisdiction of this particular case may be founded on Section 1330.

In any event, Mexico is moving for confirmation, recognition and enforcement of the award under both Section 9 of the Federal Arbitration Act and Article IV of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), which is incorporated into U.S. domestic law through 9 U.S.C. § 201.  Pursuant to 9 U.S.C. § 203, the federal courts have subject matter jurisdiction over claims arising under the New York Convention, regardless of the amount in controversy.

Because the official place of arbitration of the award at issue was Washington, D.C., and the parties participated in an arbitration hearing conducted in Washington, D.C., this Court has personal jurisdiction over both parties, and venue is properly in Washington, DC as well pursuant to 9 U.S.C. §§ 9 and 204.

## FACTS

### I.    THE AGREEMENT TO ARBITRATE

The North American Free Trade Agreement ("NAFTA") is a treaty entered into by the United States, Mexico and Canada.  House Doc. 103-159, 103d Cong., 1st Sess. (1993).  The NAFTA includes a chapter that imposes obligations on the three countries to provide certain

basic protections for foreign investors, including obligations not to discriminate on the basis of nationality, not to expropriate without fair compensation, and to accord treatment in accordance with the minimum standard imposed by customary international law.

The NAFTA establishes a procedural mechanism under which private claimants may initiate an international arbitration action directly against a government based on alleged violations of the treaty's obligations to protect investments. NAFTA Chapter Eleven, Section B. As under other international trade agreements and many bilateral investment treaties, private claimants are allowed to seek monetary damages for violations of international law obligations owed in the first instance by the NAFTA governments to each other. See Alan Redfern, et al., Law and Practice of International Commercial Arbitration Ch. 11 (4th Ed. 2004). Thunderbird availed itself of this mechanism by filing the arbitration claim which led to the award it now asks this Court to vacate.

Under NAFTA Article 1122, each of the three NAFTA federal governments (Mexico, the United States and Canada) have given advance consent to arbitrate claims that are presented in accordance with the procedural requirements set out in Chapter Eleven, Section B. Thus, Article 1122(1) provides: "Each Party consents to the submission of a claim to arbitration in accordance with the procedures set out in this Agreement." The submission of a claim to arbitration by a private party, in combination with this advance consent of the governments, constitutes an agreement to arbitrate. For the avoidance of doubt, Article 1122(2) makes clear that:

> The consent given by paragraph 1 and the submission by a disputing investor of a claim to arbitration shall satisfy the requirement of … Article II of the New York Convention for an agreement in writing ….

The arbitral tribunal was comprised of three individuals, including one each appointed by the disputing parties and a president jointly agreed upon by the parties. Thunderbird appointed

Thomas Walde, a German national who is a professor at the University of Dundee in the United

Kingdom. Letter from James D. Crosby to ISCID (Oct. 16, 2002). Becker Decl., Tab 4. Mexico

appointed Agustin Portal, a Mexican attorney in private practice. Letter from Hugo Perezcano

Díaz to ICSID (March 7, 2003). Becker Decl., Tab 12. The parties jointly agreed to have as

president of the tribunal Albert Jan van den Berg, a Dutch national – an appointment to which

Thunderbird expressly consented. Letter from James D. Crosby to ICSID (March 5, 2003).

Becker Decl., Tab 13.

NAFTA Article 1120 gives a claimant the theoretical option of selecting from two sets of

arbitration rules: the UNCITRAL Arbitration Rules, and either the International Convention on

the Settlement of Investment Disputes ("ICSID Convention"), or the Additional Facility Rules of

the ICSID.[1] The ICSID Convention can apply only when the two countries involved (the country

of the claimant and the respondent country) are members of the ICSID Convention, and the

Additional Facility Rules can apply only when the country of one (but not the countries of both)

is a member of the ICSID Convention. Because neither Mexico nor Canada is a member of the

ICSID Convention, Thunderbird was required to bring its case under the UNCITRAL Arbitration

Rules.[2]

As has been typical in NAFTA investment disputes, the ICSID was commissioned to

administer the proceedings notwithstanding that the UNCITRAL Rules were being applied. The

ICSID has facilities located in Washington, D.C. that include personnel experienced in

---

[1]    The ICSID is part of the World Bank and is headquartered in Washington, D.C.

[2]    The UNCITRAL Arbitration Rules, which are available at
http://www.uncitral.org/uncitral/en/uncitral_texts/arbitration/1976Arbitration_rules.html, are promulgated
by the United Nations Commission on International Trade Law.

administering international arbitrations of this nature and resources for translating between languages.[3]

## II.    THE ADMINISTRATION OF THE ARBITRATION

The procedural history of the arbitration is set forth in detail in paragraphs 6 through 38 of the Award.

During the arbitration, the parties exchanged two rounds of pre-hearing briefs, a four-day hearing was conducted in Washington, D.C., and there were several rounds of post-hearing submissions as well.  Both sides were allowed to submit supplemental information and evidence at different stages of the proceedings, and no evidence was excluded from the record.  For example, the tribunal permitted Thunderbird to submit new evidence, over Mexico's objection, four months after the hearing had taken place and two weeks after the final pleadings had been filed.  This led to a further round of written pleadings regarding the new evidence.  Tribunal's Procedural Order No. 9, 13 September 2004 (admitting Thunderbird's evidence dated August 3, 10 and 17, 2004).  Becker Decl., Tab 6.

The proceedings were conducted in both Spanish and English.  Mexico submitted its written filings in Spanish, and Thunderbird submitted its filings in English.  The Tribunal requested that Mexico provide an English translation of its Statement of Rejoinder (enclosed as Becker Decl., Tab 3).  Mexico prepared an English translation of its Post-Hearing Submission that was not submitted to the arbitral tribunal, but is submitted now for the convenience of the Court.  Becker Decl., Tab 7.

---

[3]        The ICSID's website is available at http://www.worldbank.org/icsid/.

The hearing was conducted in both Spanish and English. In general, at the hearing Spanish-speaking witnesses testified in Spanish, while English-speaking witnesses testified in English. There was simultaneous interpretation provided over headsets. The English language transcript attached at Tab 2 to the Becker Declaration contains the actual English language testimony and the translation into English of testimony given in Spanish.

The Award was officially issued in both Spanish and English.

### III.    THE ISSUES IN DISPUTE IN THE ARBITRATION

NAFTA Article 1131 provides that "A Tribunal established under this Section shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law." Thus, the governing law for the arbitration was international law – as set out in the NAFTA and under customary international law – and not the national laws of Mexico or the United States.

Thunderbird's arbitration claim asserted that Mexico had violated three NAFTA obligations.

First, Thunderbird alleged that Mexico had violated the obligation under Article 1102 to accord treatment to investors of another NAFTA country that is no less favorable than that accorded to domestic investors. The obligation not to favor domestic nationals over foreign nationals – the obligation of "national treatment" – is roughly analogous to the requirement of non-discrimination imposed on the U.S. states under the Commerce Clause of the Constitution.

Second, Thunderbird alleged that Mexico had violated the obligation under Article 1110 not to expropriate an investment except for a public purpose, on a non-discriminatory basis, in

accordance with due process, and on payment of appropriate compensation. The NAFTA obligations with respect to expropriation are analogous to the obligations imposed under the Takings Clause.

Third, Thunderbird alleged that Mexico had violated the obligation under Article 1105 to accord to investments of investors the minimum standard of treatment required by customary international law, including fair and equitable treatment and full protection and security. The minimum standard of treatment obligation is not directly comparable to any U.S. domestic law; the minimum standard, although somewhat amorphous, generally is directed at governmental conduct that is outrageous or shocks judicial propriety. See Organization for Economic Cooperation and Development, "Fair And Equitable Treatment Standard In International Investment Law" (Sept. 2004), *available at* http://www.oecd.org/dataoecd/22/53/33776498.pdf.

Thunderbird requested a damages award of up to $175 million. Thunderbird's Particularized Statement of Claim at 123 (Petitioner's Ex. E).

The underlying basis for the claims involved Thunderbird's creation and operation of affiliated companies in Mexico to run "gaming" facilities, where members of the public would "play" video gaming terminals. During the arbitration, it was established that the machines were operated by inserting U.S. dollar bills into receptors, and that "winning" resulted in the printing of tickets that could be exchanged for cash. Award at ¶ 164 (Becker Decl., Tab 1); Tr. at 303:10-19, 649:20-650:5 (Becker Decl., Tab 2).

It was also established that there were two basic types of machines: (i) a type in which video representations of "reels" spun, and the player pushed buttons that caused the machine to stop the reels in different combinations, and (ii) video poker, where (instead of four suits of 52

cards) the machines displayed images of four groups of 52 mining carts, the customer was "dealt" a hand, and the customer pushed buttons to indicate which carts he or she wished to retain or have re-dealt. Tr. at 486:8-19; 505:10-507:10, 510:3-511:9, 523:4-523:20. The operating manuals for the machines indicated that the operator (the casino operator, not the player) could adjust the rate of "payouts," and many of the machines displayed the odds of winning. Award at ¶ 136, Tr. at 486:8-487:5. Photographs of the actual machines installed at the Mexican facilities were submitted to the arbitral tribunal. Becker Decl., Tab 8.

Because gambling is prohibited by Mexican law, and there are no provisions for it to be permitted even with a license, the Mexican Government had closed the gaming facilities.

A key aspect of the case was that in August 2000, Thunderbird had caused its Mexican affiliate Entertainmens de Mexico S.A. de C.V. (EDM) to submit a letter to the Mexican Government agency which administers Mexico's gaming law – the Secretariat de Gobernacion – seeking an advisory opinion. Petitioner's Exhibit C. This letter is referred to as a *solicitud*. The *solicitud* described a situation in which machines requiring the use of skill – "without the intervention of luck in any manner" – would allow players to win prizes.[4] Gobernacion responded with a short letter – referred to as the *Oficio* – advising that gambling and games of chance were prohibiting and stating that if the machines were as represented, they machines would not be deemed to involve gambling or chance and would be outside of Gobernacion's jurisdiction to prohibit. The *Oficio* added that if the machines were of the type commonly known as "coin swallowers," "token swallowers," or "slot machines" they would be prohibited. Award at ¶ 161; *Oficio* at p. 2 (Petitioner's Ex. C).

---

[4]    In other words, the *solicitud* described the type of games that would normally be found at a carnival arcade. Tr. at 1126:19-1127:17, 1128:18-1129:3.

The principal basis of Thunderbird's complaint – and the main component of its motion before this Court – is that the *Oficio* should have been interpreted as some type of permit or "negative clearance" for the specific machines used at its facilities, and that Mexico therefore was prohibited by the NAFTA from closing Thunderbird's casinos. Thunderbird characterized the *Oficio* as creating a "legitimate expectation" upon which Thunderbird was entitled to rely. Thunderbird's Memorandum in Support of Motion to Vacate at 10-14.

Underlying Thunderbird's position was the fact that its investment originally had been based on advice from two private Mexican individuals (Ivy Ong and Doug Oien), who in turn had introduced Thunderbird to two other Mexican consultants, Julio Aspe and Oscar Arroyo. Messrs. Aspe and Arroyo informed Thunderbird that they had worked with José Guardia, a Mexican individual who operated gaming facilities with the same types of machines that Thunderbird wanted to use. Award at ¶ 42; Tr. at 276:1-14. The Mexican government had taken enforcement actions to close Guardia's facilities, but he had been successful, at least temporarily, in keeping some of them open under court injunctions based on alleged procedural errors in the enforcement actions pending final resolution by the courts.[5]

Thunderbird agreed to pay Messrs. Aspe and Arroyo a "success fee" of $300,000 if they could arrange for the issuance of the *Oficio* and was prepared to pay them $700,000 if they could obtain such a letter "granted exclusively for Thunderbird."[6] The core of Thunderbird's argument to the tribunal, as well as to this Court, was that Aspe and Arroyo had engaged in negotiations with Gobernacion officials prior to the submission of the *solicitud*, and that they had been

---

[5]    Award at ¶¶ 42, 43, 48; Tr. at 559:5-562:10.

[6]    Award at ¶¶ 54, 56, 150. Thunderbird wired the $300,000 to Messrs. Aspe and Arroyo via a third party the day the *Oficio* was issued. Award at ¶ 54.

assured that the *Oficio* would authorize the operation of the specific machines at issue. However, Thunderbird never presented testimony from Aspe and Orroyo regarding those negotiations, and there were no written records of their purported meetings with government officials. Further, Thunderbird itself had subsequently sued Ong and Oien for making misrepresentations on which Thunderbird claimed it had relied in making its investment. Award at ¶¶ 63, 144; Tr. at 250:17-21, 336:16-342:16. In the arbitration, Thunderbird argued that it had relied upon the Mexico City office of Baker & McKenzie to prepare the *solicitud*, but the Baker & McKenzie partner who had been involved testified that he was not informed that the machines printed tickets that could be exchanged for cash. Tr. at 567:7-14, 570:6-571:1, 577:7-21, 578:18-579:9, 649:14-650:5.

For its part, Mexico argued, among other things, that (i) the *Oficio* itself did not say what Thunderbird suggested it did, and (ii) moreover the *solicitud* did not fully or accurately describe the machines and accordingly the *Oficio* could not reasonably be interpreted to apply to them specifically. Mexico also presented evidence that Thunderbird had not in fact relied on the *Oficio* in making its investment, as it had undertaken a number of steps, such as importing the machines into Mexico and entering into leases for building space, months before it even submitted the *Oficio*. Award at ¶ 167. Further, Thunderbird had made additional investments even after Gobernacion had closed two of the "gaming" facilities, when it had plainly been put on notice that the *Oficio* was not a permit. Award at ¶¶ 68, 71-72; Tr. at 325:2-331:8.[7]

---

[7]    Mexico also demonstrated that the prospectuses Thunderbird had distributed to outside investors had expressly stated that the *Oficio* was not binding. Mexico's Post-Hearing Submission (unofficial translation) at ¶¶ 74-75, 80-81 (Becker Decl., Tab 7).

## IV.    THE AWARD

The award was issued on January 26, 2006, along with a "separate opinion" by the arbitrator appointed by Thunderbird, Mr. Walde. The tribunal first dealt with several procedural and jurisdictional objections raised by Mexico, finding in favor of Thunderbird on all of them. Award at ¶¶ 110, 118. The majority opinion went on to reject the merits of Thunderbird's claims in their entirety, and awarded Mexico a portion of its legal fees and of its share of the costs of the arbitration, totaling $1,252,862.

As Thunderbird had urged, the tribunal focused on the content of the *Oficio*. During the hearing, the Tribunal had spent much time querying the parties and witnesses regarding the meaning of the *Oficio*.[8] In its Award, the tribunal agreed with Mexico that the *Oficio*, on its face, simply stated that if the machines at issue were as represented in the *solicitud*, they would not be gambling machines and would not be subject to Gobernacion's jurisdiction. The tribunal further held that the *Oficio* could not be construed as granting approval for any specific machines because the *solicitud* had not identified any specific machines.

The Tribunal also found that gambling is prohibited in Mexico, and that the *solicitud* was not a proper disclosure because it created the appearance that the machines described were video arcade games, designed solely for entertainment purposes. Award at ¶ 155. The tribunal noted that the Baker & McKenzie attorney (Ruiz de Velasco) testified that had he known when he rendered his legal opinion on August 20, 2000 that the winning tickets were redeemable for cash, he would have most likely revised his opinion "because it probably could have bid in [sic] as gambling or betting." Award at ¶ 154. The tribunal also determined on the basis of the record

---

[8]    Tr. at 635:20-636:18, 645:15-647:2, 914:6-916:2, 922:13-924:10, 1021:1-1029:9.

evidence – including the testimony of one of Thunderbird's witnesses – that the operation of video game machines with a built-in and modifiable random number generator involved a considerable degree of chance, and that by adjusting the payout rate, the machine operator could manipulate the odds for winning regardless of the skill of the player. Award at ¶ 136.

On the basis of the foregoing, the tribunal concluded that Thunderbird could not have had a "legitimate expectation" that the *Oficio* had created any type of legal right. The tribunal also stated that the evidence indicated that Thunderbird had not actually relied on the *Oficio* in making its investment. Award at ¶ 167.

Although Thunderbird in its Motion has not complained about the tribunal's rulings on its other claims, it is useful to note that the tribunal dealt with each of them in a comprehensive fashion, after reviewing the evidence and arguments presented by the parties:

- Thunderbird argued that certain other casino operators had been able to remain open by obtaining temporary court injunctions, and that the ability of those other companies to resist closure while Thunderbird was not was proof of discrimination. The tribunal found that Thunderbird had not presented prima facie evidence that Mexico had discriminated in its enforcement of the ban on gambling. Award at ¶ 178.

- Thunderbird complained that it had been denied due process in the administrative proceedings conducted by Gobernacion before it reached its final conclusion that the machines entailed illegal gambling. The tribunal concluded that it "cannot find sufficient evidence on the record establishing that the [Gobernacion] proceedings were arbitrary or unfair, let alone so manifestly arbitrary or unfair as to violate the minimum standard of treatment." Award at ¶ 198.

- With regard to Thunderbird's expropriation claim, the tribunal held that because Thunderbird did not have a legitimate expectation that it could operate the machines in Mexico, it had no vested right in a business activity that could have been taken. Award at ¶ 208.

With regard to costs, the tribunal noted that NAFTA Article 1135 states that "[a] tribunal may also award costs in accordance with the applicable arbitration rules." It engaged in an

analysis of the pertinent provisions of the UNCITRAL Arbitration Rules, and considered rulings of other arbitration panels on this issue. The tribunal concluded that it should rely on the rate of success of a party as an "objective benchmark" of how costs should be awarded, and added that it "failed to grasp the rationale of [the] view" that an investor claimant should never be condemned to pay the costs of the governmental respondent. The tribunal also stated that "it appears to the Tribunal that the same rules should apply to international arbitration as apply in other international arbitration proceedings." Award at ¶ 213.

The tribunal decided that, in light of the fact that Mexico had prevailed on the merits but lost on the questions of jurisdiction, it would allocate the costs on a ¾ to ¼ basis. It therefore determined that Thunderbird should reimburse Mexico for ¾ of Mexico's costs of legal representation and should pay for ¾ of the total costs of the arbitration (i.e., the arbitrators' fees and expenses, the fees of the court reporters and interpreters, and other costs). The ¾ allocation of legal representation expenses amounted to $1,126,549 and, because the parties had previously split the costs of the arbitration on a 50-50 basis, Thunderbird also was obliged to reimburse Mexico for $126,313 of the payments Mexico had already made toward the arbitration costs. Award at ¶¶ 220-21. The total amount awarded to Mexico, therefore, is $1,252,862.

Article 32(2) of the UNCITRAL Arbitration Rules provides:

The award shall be made in writing and shall be final and binding on the parties.
The parties undertake to carry out the award without delay.

The award was therefore final and binding as of the date on which it was issued, January 26, 2006.

An electronic copy of the Award was delivered to Thunderbird on January 26, 2006 via email, and subsequently by courier. A copy of the email by which the award was initially dispatched to Thunderbird is submitted at Tab 9 of the Becker Declaration.

# ARGUMENT

## I. THUNDERBIRD HAS NOT MET ITS BURDEN OF DEMONSTRATING THAT THE AWARD SHOULD BE VACATED

It is well established that judicial review of arbitration awards is extremely limited, and a court may vacate an award only if there is a showing that one of the circumstances listed in the Federal Arbitration Act is present, or if the arbitrators acted in manifest disregard of the law. LaPrade v. Kidder, Peabody & Co., 246 F.3d 702, 706 (D.C. Cir. 2001). This court has explained the manifest disregard standard as follows:

> Manifest disregard of the law "means more than error or misunderstanding with respect to the law." Kanuth, 949 F.2d at 1178. Thus, a party seeking to have an arbitration award vacated on this ground must at least establish that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. LaPrade, 246 F.3d at 706 (citing DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 821 (2d Cir. 1997); see also Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 392 (2d Cir. 2003) ("Even where explanation for an award is deficient or non-existent, we will confirm it if a justifiable ground for the decision can be inferred from the facts of the case."); LaPrade v. Kidder, Peabody & Co., Inc., 94 F. Supp. 2d 2, 6 (D.D.C. 2000) ("In addition, there must be no colorable support for the Panel's award in the record; if it seems that the Panel rejected plaintiff's argument after fair consideration, then plaintiff's showing falls short, and the Court must enter the Panel's judgment.").

Alson v. UBS Fin. Servs., Inc., Civ. A. No. 04-01798 (HHK) 2006 U.S. Dist. LEXIS 656, at **8-9 (D.D.C. Jan. 2, 2006). Thunderbird has not even come close to satisfying this standard.

### A.    The Tribunal Properly Rendered Its Factual Findings On The *Oficio*

Thunderbird's motion is primarily dedicated to arguing the factual relevance of the

August 15, 2000 Gobernacion *Oficio* – in particular, restating its position in the arbitration that

Thunderbird was entitled, as a matter of international law, to rely on its interpretation of the

*Oficio* as being a permit for its casinos, and that it had in fact relied on the *Oficio* in making its

investment.  Indeed, Thunderbird presented the exact same arguments about the *Oficio* to the

NAFTA tribunal.[9]

In an effort to characterize the action as involving a "manifest disregard of the law,"

Thunderbird argues that the tribunal disregarded the appropriate burden of proof.  However, it is

obvious that Thunderbird's complaint is with the tribunal's assessment of the facts, not with its

application of the law.  The manifest disregard standard is not even relevant in such

circumstances.  See, e.g., Teamsters Local Union No. 61 v. UPS, 272 F.3d 600, 604 (D.C. Cir.

2001) ("We have repeatedly recognized that 'judicial review of arbitral awards is extremely

limited' and that we 'do not sit to hear claims of factual or legal error by an arbitrator as [we

would] in reviewing decisions of lower courts.'" (citations omitted)).

Thunderbird argues that the Tribunal did not require Mexico to "prove" that the Mexican

officials of Gobernacion actually viewed the *solicitud* as "not a proper disclosure, inadequate or

misleading."  Petitioner's Motion to Vacate, p. 17.  In fact, the Tribunal found that Mexico met

its burden because the *solicitud* itself proved the point.  For example, although Thunderbird had

---

[9]    Thunderbird's Particularized Statement of Claim (Petitioner's Ex. E), at 11-12 ("Based upon
Gobernacion's official opinion letter, Thunderbird and its counsel concluded that Thunderbird could
proceed with skill machine operations in Mexico [citations omitted].  In reliance upon Gobernacion's
official stated opinion, Thunderbird moved forward with its plans to operate skill machine facilities in
Mexico."); Tr. at 369:10-11 (statement by Thunderbird CEO Jack Mitchell that "we would not have gone
forward with putting skill machines in without that letter.")

claimed that the *solicitud* identified the specific model numbers of the games for which Gobernacion's opinion was sought, the Tribunal held that the data provided "were not proper model numbers" and that they did not even match the descriptions on invoices for the same machines. One of Thunderbird's own witnesses, who had been presented by Thunderbird as the person in charge of renovating the machines for use in Mexico, testified he was not familiar with the purported model numbers presented in the *solicitud*. Award at ¶ 157; Tr. at 445:18-446:4. Indeed, the Baker & McKenzie lawyer in charge of presenting the *solicitud* to Gobernacion testified that he did not know what the model numbers included in the *solicitud* meant. Tr. at 583:14-20, 585:11-12.

Moreover, Thunderbird presented the same arguments about the burden of proof to the tribunal as it has to this Court. As in the arbitration, it argued that Mexico was obliged to produce witness testimony from individuals who had been involved in preparing the *Oficio*, although Thunderbird itself failed to produce as witnesses its representatives and agents who Thunderbird suggested had represented that special assurances were received from Gobernacion. Mexico responded to this argument by pointing out that international arbitration must reflect the differing approaches to evidence between civil law countries such as Mexico and common law countries such as the United States, that in civil law countries documentary evidence is given much greater weight than witness testimony, and that in any event, even under U.S. domestic standards Thunderbird had not met its burden, because the *Oficio* on its face did not purport to grant approval for any specific model of machine. Mexico's Statement of Rejoinder at ¶¶ 9-13, 73-78. Becker Decl., Tab 3.

The Award refers to a remarkable development during the arbitration hearing pertinent to this issue. The Mexican Baker & McKenzie partner with whom Thunderbird worked had

prepared a legal opinion dated August 20, 2000, in which he advised Thunderbird that it could

rely on the *Oficio*. Thunderbird had cited this opinion in arguing that it had a legitimate

expectation. Particularized Statement of Claim at pp. 82-83. But during cross examination at the

hearing, the attorney indicated that he had not known that that the machines accepted dollar bills

and printed tickets redeemable for cash, and if he had, he would have changed his opinion

because in his view the activity probably would be considered gambling. Award at ¶ 154.

Thus, there was more than sufficient evidence to support the tribunal's conclusion that

Thunderbird had not met its burden of proof.

An additional key element of the award is the tribunal's finding that Thunderbird did not

actually rely on the *Oficio*:

> Finally, the Tribunal questions to what extent Thunderbird invested in Mexico in
> reliance on the *Oficio*, considering the non-negligible steps that Thunderbird had
> completed for the operation of its gaming machines prior to the issuance of the
> *Oficio* on 15 August 2000. The record shows that before 15 August 200: EDM
> had been incorporated; JDMI [another Thunderbird affiliate] had entered into a
> detailed Revenue Sharing Agreement with Messrs. Ong and Oien regarding the
> operation of the gaming facilities in Mexico (Exh. R-98); EDM had opened bank
> accounts (C-6); EDM had obtained land use permits (Ex. C-7); EDM had entered
> into a lease for a gaming facility location in Matamoros (Exs. C-3 to C-5); EDM
> had imported 50 Bestco machines and 30 SCI machines (Exs. C-9, C-87 and C-
> 15); EDM had filed an "Aviso de Apertura" for the establishment of "La Mina de
> Oro" (Ex. C-10P; and by Thunderbird's own admission in ¶ 2 of the *Solicitud*,
> EDM had already "opened a business […] in the city of Matamoros, Tamaulipas,
> under the commercial name 'La Mina de Oro', which operates video game
> machines for games of skills and ability, and complies with all Municipal
> requirements."

Award ¶ 167. The tribunal therefore had an alternative basis for determining that the *Oficio* was

not the cause of Thunderbird's investment in Mexico.

**B.    There Was No Arbitral Misconduct At All, Let Alone Misconduct Within the Meaning of Section 10(3)**

Thunderbird also argues that the tribunal engaged in misconduct under Section 10(3) of the Federal Arbitration Act by (i) allegedly making a finding that Thunderbird's machines were illegal after the parties had agreed that it lacked authority to make a ruling on the legality of the machines, and (ii) implying that the success fee arrangement between Thunderbird and Messrs. Aspe and Arroyo involved a bribe.

Although Thunderbird's complaints, on their face, do not meet the standard for having an award set aside, it is also important to note that Thunderbird has mischaracterized the content of the Award. Moreover, even if Thunderbird's characterization of what the tribunal had done was correct, its complaint does not address the standard applicable under Section 10(3), which is directed at arbitrator misbehavior in the conduct of the proceedings, such as refusing to hear relevant evidence.

**1.    The Tribunal Did Not Rule That the Machines Were Illegal Under Mexican Law**

With regard to the legal status of the machines, Thunderbird itself argued during the arbitration that the functionality of its machines was relevant to the tribunal's decision. Award at ¶¶ 128-131. More importantly, in the Award the tribunal did not make a finding that the machines were illegal under Mexican law. Rather, it commented that because gambling is illegal in Mexico, Thunderbird's machines involved at least some luck, players fed dollar bills into the machines and could win tickets to be exchanged for cash, and Thunderbird knew that the competitor on whose business its project was modeled (Guardia) had experienced legal difficulties with similar machines, it was noteworthy that Thunderbird had not disclosed more detailed information to Gobernacion about the machines in its *solicitud*. Award at ¶¶ 156-66. Its

discussion of the matter was focused on the issue of whether Thunderbird could have had a

legitimate expectation that the *Oficio* was a grant of authority to operate its specific machines.

The tribunal was careful to emphasize that it was not making on a ruling on whether the

machines were legal under Mexican law, but rather evaluating whether Mexico had complied

with the international law standards of the NAFTA. It stated:

> The Tribunal's role in this arbitration is not to determine whether the EDM machines were prohibited gambling equipment under the Ley Federal de Juegos y Sorteos, as acknowledged by both Parties. It is not the Tribunal's function to act as a court of appeal or review in relation to the Mexican judicial system regarding the subject matter of the present claims, or in relation to the [Gobernacion] administrative proceedings for that matter.
>
> Rather, the Tribunal shall examine whether the conduct of Mexico and the measures employed by [Gobernacion] in relation to the EDM entities were consistent with Mexico's obligations under Chapter Eleven of the NAFTA.
>
> The role of Chapter Eleven in this case is therefore to measure the conduct of Mexico towards Thunderbird against the international law standards set up by Chapter Eleven of the NAFTA. Mexico has in this context a wide regulatory "space" for regulation; in the regulation of the gambling industry, governments have a particularly wide scope of regulation reflecting national view on public morals. Mexico can permit or prohibit any forms of gambling as far as the NAFTA is concerned....

Award at ¶¶ 125-27.

Thus, Thunderbird's characterization of the Award amounts to a request that the Court

disregard what the Award actually states.

### 2. The Tribunal Did Not Make Any Findings on the Success Fee Arrangement

Thunderbird's complaint about the tribunal's handling of the success fee issue is a "red

herring." The tribunal did not suggest that Thunderbird had paid a bribe, as Thunderbird alleges.

Rather, the Award simply noted that the success fee arrangement might imply that the *solicitud*

and *Oficio* meant something other than what they state, but that in the absence of testimony from Messrs. Aspe, Arroyo or the Gobernacion officials responsible for issuing the *Oficio*, the tribunal was limited to interpreting the documents based on their actual language. The tribunal stated as follows:

> In the absence of any evidence on the record in relation to the "success fee" arrangement and the nature of the dealings between Messrs. Aspe and Arroyo and [Gobernacion], these facts do not have a bearing on the Tribunal's analysis below. Under those circumstances, the Tribunal can only interpret the 3 August 2000 *Solicitud* on its face value.

Award at ¶ 150.

Indeed, Mexico itself never alleged that Thunderbird had paid a bribe, and there was no evidence that the Mexican authorities had done anything other than enforce the anti-gambling law in good faith. What Mexico had pointed out was that Thunderbird had paid an extraordinarily large sum of money to private individuals to obtain a vague advisory opinion from Gobernacion, and that the success fee arrangement contemplated that the individuals might obtain for Thunderbird an "exclusive" right to operate machines of the nature it placed in its Mexican facilities – which itself was impossible because either the machines were legal (in which case anyone could offer them) or they were not (in which case no one could). Mexico emphasized that it could not be held responsible for representations that the private individuals had made to Thunderbird about their ability to obtain some type of special authorization that could not actually exist. Tr. at 243:9-251:1, 277:1-288:21, 1113:1-21.[10]

---

[10]    Strangely, Thunderbird had wired the $300,000 it agreed to pay to these individuals to an unrelated third person, and Thunderbird's CEO could not explain the identify of that person and why the money was sent to him. Tr. at 382:21-385:20. Thunderbird's CFO, who had been called as a witness and presumably knew the answer, fled Washington, D.C. the evening before he was scheduled to appear at the hearing, and Thunderbird offered no explanation to the tribunal as to why the controller had suddenly declined to testify. Tr. at 938:20-939:21.

C.    **The Award of Costs Was Based On Established Law And Practice**

Thunderbird also complains that the award of costs to Mexico was a manifest disregard of the law. It does not explain, however, what "law" the tribunal allegedly disregarded.

The awarding of costs in UNCITRAL arbitration proceedings is addressed by Rule 40, which states:

> (1) Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.
>
> (2) With respect to the costs of legal representation and assistance referred to in article 38, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.[11]

The tribunal invited both parties to comment in their post-hearing briefs on whether costs should be awarded. In its filing, Thunderbird acknowledged that the UNCITRAL rules granted the tribunal broad discretion, but then proceeded to argue that costs should never be awarded against claimants, only against respondent governments. Thunderbird Post-Hearing Brief at 70 (Petitioner's Exhibit G).[12] However, Thunderbird cited to no rule of law (nor could it) in support of its position that costs may only be awarded to a claimant and not to a respondent. Subsequently, on August 26, 2004 and March 31, 2005, Thunderbird submitted its statements of costs to the tribunal in support of its request for an order on costs. Becker Decl., Tab 10.

---

[11]    Article 38(3) includes in the definition of "costs": "The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the tribunal determines that the amount of such costs is reasonable ...."

[12]    In making that argument, Thunderbird incorrectly claimed that costs had never been awarded against a claimant in a NAFTA investor-state arbitration.

For its part, Mexico also asked for an award of its costs, noting that Thunderbird's claims in the arbitration had been weak, that it had withheld documents on an invalid basis that interfered with Mexico's preparation of its case, and that Thunderbird's officers had presented conflicting and plainly incorrect testimony. Mexico's Post-Hearing Submission (unofficial English translation) at ¶¶ 282-285. Becker Decl., Tab 7. Mexico also submitted statements of its costs to the tribunal, on August 13, 2004 and March 31, 2005. Becker Decl., Tab 11.

As discussed above, the tribunal ultimately decided that the conduct of the parties during the arbitration was not pertinent; rather, it based its determination on an objective measurement of the relative success of the parties in the arbitration. It grounded its approach on the plain language of the UNCITRAL Rules. That alone is sufficient to reject Thunderbird's claim that the tribunal engaged in a manifest disregard of the law.

Moreover, Thunderbird's argument that notwithstanding the governing law, there is a binding practice of restricting the award of costs for the benefit of claimants is unsupportable. Costs were awarded to the respondent governments in the NAFTA cases Waste Management v. United Mexican States, Case No. ARB(AF)/00/3, ICSID Additional Facility Rules, May 26, 2000 ($92,000) (*available at* http://www.worldbank.org/icsid/cases/waste_award.pdf), Methanex v. United States, UNCITRAL Rules, Aug. 3, 2005, ($4.061 million) (*available at* http://www.state.gov/documents/organization/51052.pdf), and Pope & Talbot v. Canada, UNCITRAL Rules, Sept. 27, 2000 ($10,000) (*available at* http://www.dfait-maeci.gc.ca/tna-nac/documents/pubdoc9.pdf), as well as in the Thunderbird case, while costs were awarded to the claimants in Pope & Talbot v. Canada, UNCITRAL Rules, Nov. 26, 2002 ($120,200) (*available at* http://www.dfait-maeci.gc.ca/tna-nac/documents/CostsAward26Nov02.pdf) and SD

<u>Meyers v. Canada</u>, UNCITRAL Rules, Dec. 30, 2002 (CAN$850,000) (*available at*

http://www.dfait-maeci.gc.ca/tna-nac/documents/MyersFinalAward-Final-30-12-02.pdf).

Importantly, the relevant standard is the application of Rule 40 in all arbitrations

governed by the UNCITRAL Arbitration Rules, not just NAFTA cases. It is well recognized

that the UNCITRAL Rules grant broad discretion for the award of legal fees. <u>See, e.g.</u>, Redfern

et al., <u>supra</u>, at 396-99. Of course, the awarding of legal fees is not restricted to the UNCITRAL

Arbitration Rules:

> In general, … the procedure in international commercial arbitration is for the
> arbitral tribunal to have power to require the losing party to pay or contribute
> towards the legal costs of the winning party. The UNCITRAL Rules, the ICDR's
> Rules, the ICC Rules, the LCIA Rules, the SCC Rules and the WIPO Rules each
> make it clear that the arbitral tribunal has such power.

<u>Id.</u> at 397.

The practice of awarding fees and costs on a basis proportional to the parties' success is

also well known in international arbitration, such as under the rules of International Chamber of

Commerce International Court of Arbitration. <u>See, e.g.</u>, Final Award No. 5649 (1987), *reprinted

in* 14 Y.B. Com. Arb. 174, 179 (1989) (ordering that claimant pay three fourths of the ICC's

administrative fees and arbitrators' fees, and that respondent pay one fourth); Final Award No.

2795 (ICC 1977), *reprinted in* 4 Y.B. Com. Arb. 210, 212 (1979) (awarding claimant damages

but also ordering claimant to pay 90% of the costs of the arbitration).[13]

---

[13]  The so-called "American Rule," under which litigants in the U.S. courts generally are expected to bear their own costs, does not apply in international arbitration.

## II.    THE AWARD SHOULD BE RECOGNIZED AND CONFIRMED

Mexico is moving for confirmation of the award under both Section 9 of the Federal

Arbitration Act and Article IV of the New York Convention.

Section 9 of the Federal Arbitration Act provides that if an award has not been vacated,

modified or corrected, the Court must grant an order confirming the award. Therefore, upon

determining that the award will not be set aside, this Court should enter an order confirming it

under Section 9.

Article IV of the New York Convention provides as follows:

> 1.     To obtain the recognition and enforcement mentioned in the preceding
> article, the party applying for recognition and enforcement shall, at the time of the
> application, supply:
>
>> (a) the duly authenticated original award or a duly certified copy thereof;
>>
>> (b) the original agreement [to arbitrate] referred to in article II or a duly
>> certified copy thereof.[14]

A copy of the award, authenticated by the ICSID, is submitted with the Becker

Declaration at Tab 1. As described above, the agreement to arbitrate is comprised of NAFTA

Chapter Eleven and Thunderbird's act of submitting its claim to arbitration.

Pursuant to Article V of the Convention, recognition and enforcement of the award may

be refused only if the party against whom it is invoked furnishes proof that:

> (a)     The parties to the [arbitration] agreement … were, under the law
> applicable to them, under some incapacity, or the said agreement is not valid
> under the law to which the parties have subjected it or, failing any indication
> thereon, under the law of the country where the award was made; or

---

[14]    NAFTA Article 1136(1) states "A claim that is submitted to arbitration under this Section shall be considered to arise out of a commercial relationship or transaction for purposes of Article I of the New York Convention."

(b)    The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c)    The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d)    The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e)    The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

Convention, Art. V., 9 U.S.C. § 201.

Thunderbird initiated the arbitration, and therefore cannot claim that it was not given proper notice or that the arbitral tribunal or procedure was not in accordance with the arbitral agreement. Thunderbird also cannot argue that the award dealt with any dispute other than the one it raised itself, or that the award has not yet become binding. Accordingly, this Court should enter an order confirming the award under the New York Convention.

## CONCLUSION

For the foregoing reasons, the Government of Mexico respectfully requests that the Court reject Thunderbird's Motion to Vacate, grant the Government of Mexico's Cross-Motion for Confirmation, Recognition and Enforcement of Arbitral Award, and issue an order recognizing and confirming the Award and directing Thunderbird to pay the Government of Mexico the amount of $1,252,862.

Dated:  July 7, 2006

PILLSBURY WINTHROP SHAW PITTMAN LLP

By:      /s/ Stephan E. Becker
        Stephan E. Becker (D.C. Bar No. 366676)
        Anne E. Langford (D.C. Bar No. 492271)

        2300 N Street, N.W.
        Washington, D.C.  20037
        (202) 663-8000

        Counsel for United Mexican States

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of July, 2006, the foregoing Cross-Motion for

Confirmation, Recognition and Enforcement of Arbitral Award, Memorandum of Points and

Authorities in Support thereof, and Declaration of Stephan E. Becker (and supporting

documents) were served via first class mail, postage prepaid, on the following:

Christopher W. Mahoney
DUANE MORRIS LLP
1667 K Street, N.W. Suite 700
Washington, DC 20006

James D. Crosby
Attorney at Law
13400 Sabre Springs Parkway, Suite 200
San Diego, CA 92128

/s/ Stephan E. Becker
Stephan E. Becker