# EXHIBIT 1

THUNDERBIRD RESORTS, INC.

CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States Dollars)

DECEMBER 31, 2006

# Oliva, Sahmel & Goddard
## CERTIFIED PUBLIC ACCOUNTANTS

## AUDITORS' REPORT

To the Shareholders of
Thunderbird Resorts, Inc.

We have audited the consolidated balance sheets of Thunderbird Resorts, Inc. as of December 31, 2006 and 2005 and the consolidated statements of operations and deficit and cash flows for the years then ended. These financial statements, expressed in United States dollars, are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with Canadian generally accepted auditing standards. Those standards require that we plan and perform an audit to obtain reasonable assurance whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as, evaluating the overall financial statement presentation.

In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2006 and the results of its operations and its cash flows for the years then ended in accordance with Canadian generally accepted accounting principles.

"OLIVA, SAHMEL & GODDARD"

Certified Public Accountants

San Diego, CA

April 27, 2007

4510 Executive Drive, Suite 113 – San Diego, CA 92121-3022 Telephone (858) 554-0800 Fax (858) 554-0865

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

1. **NATURE OF OPERATIONS**

   Thunderbird Resorts, Inc.'s (the "Company") primary business activity is the provision of services to the gaming industry. The Company is, or has been involved in, the following business activities:

   - Managing gaming operations under a Casino Administration and Operations contract dated January 29, 1998 in the Republic of Panama in which the Company also has a 50% interest. Properties managed are as follows;

   | Name | Location | Type |
   |---|---|---|
   | Fiesta Casino - El Panamá | Panama City, Panama | Casino |
   | Fiesta Casino - Soloy | Soloy, Panama | Casino |
   | Fiesta Casino - David | David, Panama | Casino |
   | Fiesta Casino - Colón | Colón, Panama | Casino |
   | Fiesta Casino - Chitré | Chitré, Panama | Casino |
   | Fiesta Casino - Decámeron | Decámeron, Panama | Casino |

   - Managing a video lottery operation in Guatemala, on a revenue and net profit sharing basis, under a Service and Supply agreement which expired in February 2003. In March 2003, the Company entered into a new five year agreement whereby the Company receives 65% of the net wins, which is defined as total revenues less awards paid and taxes withheld from award winners, and incurs 100% of the operating costs. The agreement expires in March 2008. During the later part of 2006 and the beginning of 2007 the Company entered into a new management agreement for its new video lottery location that opened in Februrary 2007, note 19 (b). The management contract structure has lowered the license fee and is expected to result in increased profits as new operations stabilize. Properties managed, as follows;

   | Name | Location | Type |
   |---|---|---|
   | Intercontinental Hotel | Guatemala City, Guatemala | Video Gaming Parlor |
   | Mazatenango | Guatemala City, Guatemala | Video Gaming Parlor |
   | Coateqeque | Guatemala City, Guatemala | Video Gaming Parlor |

   - Managing a gaming operation in Costa Rica, of which the Company retained a 50% interest in October 2003. Properties managed are as follows;

   | Name | Location | Type |
   |---|---|---|
   | Fiesta Garden Court | San Jose, Costa Rica | Casino |
   | Fiesta Presidente | San Jose, Costa Rica | Casino |
   | Fiesta Heredia | Heredia, Costa Rica | Casino |
   | Gran Casino | San Jose, Costa Rica | Slot Parlor |
   | Lucky's - San Carlos | San Carlos, Costa Rica | Slot Parlor |
   | Lucky's - Guapiles | Guapiles, Costa Rica | Slot Parlor |
   | Lucky's - Tournon | Tournon, Costa Rica | Slot Parlor |
   | Slot Routes - 2 Nationwide | Costa Rica | Slot Route |

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

1. **NATURE OF OPERATIONS (Cont'd...)**

   - Managing gaming operations in Nicaragua through its majority owned subsidiary Buena Esperanza Limited, S.A. ("Buena"). In March 2003, the Company entered into an agreement to merge the Company's gaming operations in Nicaragua with the gaming operations of Hopewell Limited S.A. ("Hopewell"). The Company owned a 20.54% equity interest in the merged entity. In October 2004, the Company purchased an additional 32% of the common shares and now controls 52.6% of the operations, which has three casinos. Properties managed are as follows;

     | Name | Location | Type |
     |---|---|---|
     | Pharaohs Casino - Airport | Managua, Nicaragua | Casino |
     | Pharaohs Casino - Camino Real | Managua, Nicaragua | Casino |
     | Pharaohs Casino - Holiday Inn | Managua, Nicaragua | Casino |

   - Managing a casino and hotel in the Philippines, which opened in April 2005, in which the Company has a 60% interest (Note 9e). In conjunction with the terms of the agreement with its local partners, the Company also has a 40% equity interest in a property and development company. Additionally the Company manages another casino in the Philippines, which opened in April 2006, in which the Company has a 61% interest. Properties managed are as follows;

     | Name | Location | Type |
     |---|---|---|
     | Fiesta Casino - Rizal | Manila, Philippines | Casino |
     | Fiesta Casino - Poro Point | La Union, Philippines | Casino |

   - Managed operations at three skill game locations in Mexico in which the Company had an equity interest. During 2001, the Mexican government closed the skill game facilities in Matamoros, Nuevo Laredo and Reynosa, Mexico in which the Company had an equity interest, alleging the operations are in violation of the law. The Company has filed a $100 million claim under section 11 of the North American Free Trade Agreement ("NAFTA") subsequent to exhausting all other avenues for an equitable settlement with the Mexican government. A ruling on this matter was made on January 26, 2006. Two of the three NAFTA tribunal arbitrators rejected the Company's claims for damages sought as a result of the closure of its skill game facilities by Secretaria De Gobernacion. The Tribunal awarded Mexico with approximately $1,250,000 in costs and attorney fees as a "prevailing party". It did so in spite of the dissenting arbitrator's acknowledgement that such an award would be unprecedented. The NAFTA tribunal ruled that Mexico did not violate NAFTA in shutting down the Company's skill game and entertainment facilities. The decision made by the NAFTA tribunal is inconsistent with the 'reality' that there is a proliferation in the establishment of 'skill game' operations throughout Mexico. The same government that closed the Thunderbird operations has given permits for hundreds of new locations with the exact type of machines. On April 24, 2006, the Company filed a Motion to Vacate the Arbitrators' decision with the U.S. Federal District Court in Washington D.C.. The basis of the motion is that the arbitrator's decision is manifestly unjust and in total disregard of the law. On February 14, 2007 the U.S. Federal District Court agreed with the NAFTA tribunal; however, the Company has filed an appeal to a higher court.

   The Company actively evaluates new opportunities presented or identified from time to time in the gaming industry. The relative importance of each business is based on the revenues generated from each segment.

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

1. **NATURE OF OPERATIONS (Cont'd...)**

   The Company's shareholders voted nearly unanimously in favor of continuing the Company's charter from the Yukon, Canada to the British Virgin Islands. The Company formally continued its corporate charter into the BVI effective October 6, 2006 and filed "discontinuation documents" with the Yukon Registrar. As disclosed in the Company's "Special Meeting Circular", Thunderbird does not carry on business nor have any material assets in Canada and does not plan to commence business operations in Canada in the future. Since 1997, Thunderbird has developed 23 branded casino and video lottery projects outside of Canada. The Company continues its focus on international development plans. It believes that the greatest opportunity to increase the Company value occurs in "developing markets". The Company has created a development team based in Manila, Philippines that is working on opportunities in the Southeastern and Central Asian region, where negotiations on certain projects are underway. The Company has expanded its development strategy to include hotels and recreational amenities in many of its new projects. This strategy should create a significant asset base over time.

2. **SIGNIFICANT ACCOUNTING POLICIES**

   **Basis of consolidation**

   These consolidated financial statements include the accounts of the Company, its subsidiaries and, on a proportionate basis, the accounts of its joint ventures. Significant inter-company balances and transactions with subsidiaries and the Company's proportionate share of inter-company balances and transactions with joint ventures are eliminated upon consolidation.

   **Use of estimates**

   The preparation of financial statements in conformity with Canadian generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant areas requiring the use of management estimates include the determination of the recoverability of accounts and amounts receivable, investments, property and equipment and other assets, the amortization rates of capital assets and other assets. Actual results could differ from those estimates.

   **Cash and cash equivalents**

   Cash equivalents consist of highly liquid investments that are readily convertible to known amounts of cash and generally have original maturities of three months or less.

   **Accounts and amounts receivable**

   Accounts and amounts receivable are reported at face value less any provisions for uncollectible accounts considered necessary. Accounts receivable primarily includes receivables due from the Company's non-eliminated interests in its Panama and Costa Rica joint venture. Amounts receivable primarily consists of notes receivable from various parties as described in Note 4. The Company estimates allowances on amounts receivable when there are indications that an impairment exists, at which point the amounts will be written down to their collectible values.

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

---

**13.  INCOME TAXES (Cont'd)**

b) Potential future tax benefits

At December 31, 2006, the Company has Canadian non-capital loss carry forwards of approximately $8.3 million and United States' operating losses of approximately $20 million. The Canadian non-capital loss carry forwards and United States' operating losses expire at various dates prior to 2014 and 2024, respectively. The potential income tax benefits related to the Canadian loss carry forwards and the United States' operating losses have not been reflected in the accounts.

**14.  RELATED PARTY TRANSACTIONS**

Included in accounts receivable is $2,292,000 (2005 - $2,564,000) due from Thunderbird Panama. Also included in accounts receivable is $431,000 (2005 - $496,000) due from Thunderbird de Costa Rica S.A. These amounts represent the balances due in excess of the Company's proportionate share of the net assets included on consolidation.

Included in accounts receivable is $521,000 (2005 - $310,000) receivable from officers of the Company. The receivable amounts are unsecured, non-interest bearing and due on demand. Included in accounts payable is $523,000 (2005 - $312,000) of bonuses payable to the officers, which will be offset against the receivable balance. The balance of the receivable will be satisfied by the application of future bonus payments to the employee.

Included in loans payable is $1,452,000 (2005 - $1,696,000) due to related parties.

Included in amounts receivable are share purchase loans totaling $36,000 (2005 - $36,000) due from certain management and officers of the Company. The amounts are secured by non-interest bearing notes and shares of the Company.

The transactions described above are in the ordinary course of business and are on normal commercial terms. Transactions with these related parties are recorded at the exchange amount, which is based on the consideration given for the service provided.

**15.  COMMITMENTS AND CONTINGENCIES**

a) As at December 31, 2006, minimum operating lease payments of the Company and the Company's share of minimum operating lease payments of joint ventures were as follows:

| | |
|---|---:|
| 2006 | $ 3,754 |
| 2007 | 3,889 |
| 2008 | 2,310 |
| 2009 | 2,161 |
| 2010 | 2,179 |
| Thereafter | 16,782 |
| | $ 31,075 |

In addition to the above, Thunderbird Panama is committed to pay minimum annual rentals for two of the casinos equal to 9% of the net win less the income participation payable to the Government of the Republic of Panama.

Rent expense for the year ended December 31, 2006 was $3,831,000 (2005 - $3,197,000).

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

---

15. **COMMITMENTS AND CONTINGENCIES** (cont'd..)

   b) Thunderbird Panama is committed to pay the Government of the Republic of Panama an annual minimum income participation equal to $4,216,000 in the first year, which increases by 2% per year, or 10% of Thunderbird Panama's gross income, whichever is higher. This commitment commenced in August 1998, on the opening of the first casino in the Republic of Panama, and related payments commenced shortly thereafter. Amounts paid under the agreement by Thunderbird Panama were $4,595,000 in 2006 (2005 - $4,716,000).

   c) Thunderbird Panama is committed to pay a 2% profit interest, defined as gross revenue less operating expenses, in the Panamanian operations to a third party. The Company is committed to pay to a third party $6,700 (2004 - $6,700) each month while operations continue in the Republic of Panama commencing July 1999, for a maximum of 10 years. During the year ended December 31, 2004, the Company prepaid half of the remaining balance of this obligation at a discounted rate and is amortizing the payment over the remaining life of the original maximum of 10 years.

   d) The Company has opened both of its Philippine casinos under the Philippine Gaming authority's (PAGCOR) charter. Under this charter PAGCOR is granted an exemption from tax, income or otherwise, as well as exemption from any form of charges, fees, or levies, except a 5% franchise tax on the gross revenue or earnings derived by PAGCOR on its casino operations. The Company, upon the advice rendered by PAGCOR, is of the opinion that the tax benefits granted to PAGCOR under its charter inures to the benefit of, and extend to corporations, associations, agencies, or individuals with whom PAGCOR has any contractual arrangement in connection with the operation of the casinos. This taxation status of the Company's Philippine operations have come under scrutiny from the local and national Philippine tax authorities due to the recent passing of two laws that challenge the tax incentives offered to PACCOR and its Franchisees. Republic Act No. 9337 (RA 9337) Section 27(c) removed PAGCOR from the list of government-owned and controlled entities subject to tax exemptions. Additionally, the Philippine Bureau of Internal Revenue (BIR) has consistently taken the position that effective January 1, 2006, under Section 102 for RA 7716 (now section 108 of NIRC of 1997), PAGCOR ceased to qualify for payment of franchise tax in lieu of all other taxes. The BIR ruled that legislative franchises grantees, except only 'electric, gas and water utilities' have been expressly subjected to the 10% VAT pursuant to this Section 102. Based on the BIR ruling and RA 7716, the Company, as a franchisee of PAGCOR, may be subject to payment of VAT, at its Rizal location, as the Poro Point location is in a special economic zone, clearly exempt from VAT. The Company has taken the position that the tax issue is being currently contested by PAGCOR and until the issue is settled or becomes law by way of ruling of the Supreme Court, no accrual for the VAT or any other tax will be made by the Company. The estimated VAT liability arising from the Rizal casino's 2006 activity is approximately US$650,000. The Company's position on RA 9337 and the BIR ruling is based on the following:

   a. PACGOR's legal position is fully stated in a Petition filed in the Supreme Court in March 2007 wherein PAGCOR is requesting that the Supreme Court rule that PAGCOR is exempt from the payment of all local taxes (" ... it being adopted that Eastbay is a contractee of PAGCOR:" and exempt as well). In the Pettition of March 2007 PAGCOR referred to various precedent including the position taken by the Philippine Department of Justice when it promulgated a resolution in PACCOR vs. The Bureau of Internal Revenue declaring that PAGCOR is exempt from the payment of all taxes, save for the franchise tax as provided under section 13 of PD 1869, as amended. (OSJ Case No 2004-1 promulgated on December 22, 2006). In addition PAGCOR is relying on the recent Supreme Court ruling on The Commissioner of Internal Revenue v Acesite Hotel Corporation (Acesite Case).

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

---

15. **COMMITMENTS AND CONTINGENCIES** (cont'd..)

In the Acesite case (regarding payment of VAT by contractors of PAGCOR), dated February 16, 2007, the SC anchored its decision on Section 13 (2) of the PAGCOR Charter which states that "no tax of any kind or form, income or otherwise, as well as fee, charges or levies of whatever nature, whether National or Local, shall be assessed and collected under this Franchise from the Corporation (PAGCOR); nor shall any form of tax or charge attach in any way to the earnings of the Corporation..." The SC interpreted this as a blanket exemption, which does not distinguish whether the taxes are direct or indirect. The SC also noted that by extending the exemption from indirect taxes, considering that such taxes would, by their nature, be otherwise or passed on by said entities or individuals to PAGCOR as the buyer, transferee, or lessee. Thus, not withstanding RA 7716, the SC still invoked PAGCOR's exemption under its Charter. This necessarily implies that PAGCOR's exemption under its Charter continued to remain in full force and effect notwithstanding the affectivity of RA 7716.

b. The Petition for Certiorari and Prohibition before the Supreme Court filed by PAGCOR in case No. C.R. 172087 dated April 17, 2006. This Petition is supported by the highest level legal department that being the Office of the Solicitor General, who filed a "Manifestation in Lieu of Comment" dated April 25, 2006. PAGCOR's position that its government corporate body is exempt from all taxes (except the 5% franchise tax), including VAT and income tax, is clearly set forth in this Petition. The Petition and the Manifestation seek to declare Republic Act No. 9337 "NULL AND VOID" as it relates to the tax exemption enjoyed by PAGCOR under section 13(2) of the PAGCOR Charter.

c. No output VAT has been paid by PAGCOR since January 1, 1996 nor has there been any payment of income tax for the period November 1, 2005 to December 31, 2005.

e) The Company's casino in Poro Point, Philippines is required by the lease agreement with the Base Conversion Development Authority (BCDA), Poro Point Management Corporation (PPMC), and the Memorandum of Agreement with PAGCOR to complete a PHP 5.2 billion, US$100 million, investment in phases which are as follows:

| Phase | Required Completion Date | Investment Amount | Expected Timing of Cash Outflows | | |
|---|---|---|---|---|---|
| | | | 2005 and 2006 | 2007 | 2008 and After |
| 1 | 2006 | PHP 162,300,000 | PHP 162,300,000 | PHP          - | PHP          - |
| 2 | 2008 | 216,400,000 | 80,000,000 | 26,400,000 | 110,000,000 |
| 3 | To be determined | 193,300,000 | | | 193,300,000 |
| 4 | To be determined | 1,928,000,000 | | | 1,928,000,000 |
| 5 | To be determined | 2,700,000,000 | | | 2,700,000,000 |
| | | PHP 5,200,000,000 | PHP 242,300,000 | PHP 26,400,000 | PHP 4,931,300,000 |

Start of work on Phases 3, 4 and 5 depends on the completion of phases preceding them. Phases 3, 4 and 5 are required to be completed within 36 months, 60 months and 120 months, respectively, from the date of signing of the renewal/extended Grant of Authority from PAGCOR to the Company, or until the expiration of the new/extended franchise, whichever comes first.

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

---

15. **COMMITMENTS AND CONTINGENCIES** (cont'd..)

The Company's agreements with PAGCOR and PPMC/BCDA requires the Company to make deposits amounting to PHP 5.2 billion (US$100 million) with local bank acceptable to PAGCOR and PPMC/BCDA. The investment will be funded entirely from sources external to the Philippines. The Company is authorized to draw from such deposit for the construction costs and other fees for the development of the investment commitment. The investment amount shall be exhausted for each phase of the project.

f) The Company's casino in Rizal, Philippines is required by the addendum to the MOA with PAGOR dated January 18, 2006 to complete a PHP 2.5 billion US$50 million, investment in phases which are as follows:

| Phase | Required Completion Date | Investment Amount | Expected Timing of Cash Outflows 2005 and 2006 | 2007 | 2008 and After |
|---|---|---|---|---|---|
| 1 | January 18, 2009 | PHP 1,505,000,000 | PHP 448,933,333 | PHP 524,066,666 | PHP 532,000,001 |
| 2 | See note below | 1,015,000,000 | - | - | 1,015,000,000 |
| | | PHP 2,520,000,000 | PHP 448,933,333 | PHP 524,066,666 | PHP 1,547,000,001 |

The Company committed to complete Phase 1 within a period of 36 months from signing the Addendum to MOA. The fulfillment of the tasks for the years 2008 and thereafter that fall beyond July 11, 2008, which is the expiration of the present franchise of PAGCOR, are contingent on all of the following circumstances that:

a. PAGCOR is given a new franchise or its present franchise is extended beyond July 11, 2008.
b. The authority of PAGCOR to grant license to operate a private casino within the special economic zones falls within the scope of the new franchise or the extended franchise, whichever is applicable; and,
c. PAGCOR grants unto the Company and TRI extension of the authority to operate the Fiesta Hotel and Casino in Rizal.

As of December 31, 2006, the Company had already spent PHP 561.9 million for the phase one of the commitment.

e) Thunderbird Gaming Inc. ("TGI"), a wholly-owned subsidiary of the Company that has been inactive since 1996, received notification of a reassessment from the Canada Revenue Agency ("CRA") with respect to a transfer of assets in 1996 in relation to the California Indian gaming business previously operated by TGI. Specifically, this reassessment stems from a transfer of assets which CRA contends was under valued. The reassessment is in the amount of CDN$380,000.

To date, TGI has submitted applications to CRA utilizing its net operating loss ("NOL") in a manner that reduced the actual tax liability to zero and is taking the position that the valuation of assets was accurate in order to preserve its NOL. By taking this position, TGI believes it avoids the imposition of interest on tax, which is the subject of the reassessment. Further, TGI has filed a fairness application with the appropriate Canadian taxing authority requesting a complete abatement of the alleged interest imposed on the alleged tax liability. In this filing, management alleges that TGI received unconscionable and egregious treatment from CRA in addition to experiencing excessive delays in the reassessment process. TGI has also recently filed an appeal of CRA's assessment with the tax courts in Canada in which TGI will attempt to establish that the underlying tax liability should never have been assessed. The fairness application and appeal to the tax courts in Canada are pending.

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

---

15. **COMMITMENTS AND CONTINGENCIES** (cont'd..)

   Although the Company believes CRA's case is without merit, the liability is contained within an insolvent subsidiary and consequently the Company agreed that the TGI company is responsible for the liability to avoid any further costs to challenge the reassessment. The Company does not expect that CRA will collect the judgment as TGI is insolvent and therefore there is no accrual in these consolidated financial statements related to this reassessment.

   f) The Company's 1999, 2001, and 2002, are under audit by Canada Revenue Agency ("CRA"). On January 26, 2006, the Company received notification of a proposed reassessment from the CRA with respect to its reported income on its 1999, 2001, and 2002 Tax returns. The basis for the proposed re-assessment is twofold: (1) the receipt and payment of management fees the company charged to its subsidiary operations and (2) the alleged failure to report settlement proceeds from California Indian gaming business. To date, the Company has submitted a vigorous challenge to the re-assessment. In any event, if the Company is not successful in its challenge, the entire re-assessed tax will be offset by the Company's net operating loss ("NOL") in a manner that will reduce the actual tax liability to zero. CRA is also assessing a tax penalty alleging the company failed to report the Indian settlement proceeds as taxable income and that a tax penalty is not reduced or eliminated by the NOL the Company is contending that the penalty is without basis in fact and in law. The Company's subsidiary operation Thunderbird Greeley Inc. properly reported the Indian Settlement proceeds. In October of 2006 the Company received an assessment of approximately $880,000 for a tax penalty (including interest). The Company is filing a notice of appeal and is vigorously opposing the assessment of the tax penalty taking the position that the income was property reported in the United States Tax returns upon the advice of its tax preparer.

   g) International Thunderbird Gaming Corporation vs. Government of Mexico. The Company's Mexico Operations were shut down by Gobernacion on October 11, 2001. The Company filed a claim against the government of Mexico pursuant to the North American Free Trade Agreement (NAFTA). A ruling on this matter was made on January 26, 2006. Two of the three NAFTA tribunal arbitrators rejected the Company's claims for damages sought as a result of the closure of its skill game facilities by Secretaria De Gobernacion. The Tribunal awarded Mexico with approximately $1,250,000 in costs and attorney fees as a "prevailing party". It did so in spite of the dissenting arbitrator's acknowledgement that such an award would be unprecedented. The NAFTA tribunal ruled that Mexico did not violate NAFTA in shutting down the Company's skill game and entertainment facilities. The decision made by the NAFTA tribunal is inconsistent with the 'reality' that there is a proliferation in the establishment of 'skill game' operations throughout Mexico. The same government that closed the Thunderbird operations has given permits for hundreds of new locations with the exact type of machines. On April 24, 2006, the Company filed a Motion to Vacate the Arbitrators' decision with the U.S. Federal District Court in Washington D.C.. The basis of the motion is that the arbitrator's decision is manifestly unjust and in total disregard of the law. On February 14, 2007 the U.S. Federal District Court agreed with the NAFTA tribunal; however, the Company has filed an appeal to a higher court.

   h). Brannon vs. International Thunderbird Gaming Corporation and Entertainmens De Mexico S.A. This lawsuit was filed in relation to the Company's investment in the skill game operations in Mexico. Brannon claims that the Company owes him $350,000 including interest stemming from his transfer of all interest he had in the entity, Entertainmens de Mexico. The Company vigorously defended the action and also filed a cross claim against Brannon claiming fraud and misrepresentation of Brannon's assertion that the Company could take over the business and operate the skill game facility. The parties negotiated a standstill agreement in which the case will be delayed until after the NAFTA trial is concluded. On September 12th, 2006 the Superior Court of San Diego ruled in favor of Brannon, awarding a total of $546,000, which includes interest and attorney's fees. The Company filed an appeal to the California Court of Appeals on the basis that the trial judge's ruling was egregiously in error.

**THUNDERBIRD RESORTS, INC.**
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Expressed in United States dollars)
(Tabular amounts expressed in thousands of dollars except per share amounts)
DECEMBER 31, 2006

---

15.  **COMMITMENTS AND CONTINGENCIES** (cont'd..)

   i)  Pardini & Asociados v. International Thunderbird Gaming Corporation: This lawsuit was filed in the latter part of 2004. Pardini is a law firm in Panama City Panama claiming that the company owes it fees for assisting in the Panama casino bid back in 1998. The company deems this matter completely frivolous and intends a vigorous defense. The Company entered into an agreement with attorney Juan Raul Delaguardia who has agreed to indemnify and hold the company free and harmless from any all liability which may be imposed by court.

   j)  The Company was engaged in a "legal challenge" in its quest to be included as a bidder in the Chile Bid Process. On April 5, 2006, the Santiago Court of Appeals unanimously ruled (3-0) in favor of Thunderbird's petitions against the Chilean Gaming Commission's resolutions that had excluded Thunderbird from the current casino bid process. The Court found that the Gaming Commission's resolutions were arbitrary and illegal. The Commission appealed the decision to the Supreme Court. The Supreme Court ruled against the Company and no further legal challenges are now pending. The Company's Chilean subsidiaries are engaged in litigation in Chile with respect to potential collection of damages incurred by the Company but the Company is not expecting any material impact to its financials as a result of these proceedings.

   k)  As at December 31, 2006, principal payments required under the terms of the loan agreements and their liabilities in each of the next five years are as follows:

| Year ending December 31: | |
|---|---:|
| 2007 | $ 10,997 |
| 2008 | 13,059 |
| 2009 | 11,928 |
| 2010 | 6,658 |
| 2011 | 2,072 |
| Thereafter | 2,124 |
| Less: Debt Issuance Costs | (585) |
| | $ 46,253 |

16.  **DISCLOSURES ABOUT FAIR VALUES OF FINANCIAL INSTRUMENTS**

   **Fair value:**

   The carrying amount of cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities and income taxes payable approximate their fair value because of the short-term maturities of these items. The carrying amount of the restricted cash approximates fair value because of the high liquidity of the item. Certain of the Company's amounts receivable, loans payable and other payables do not bear any interest, bear fixed rates of interest or are due to related parties and accordingly, the fair value of these financial instruments cannot be determined.

   **Credit risk:**

   Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash and cash equivalents, accounts receivable and amounts receivable. The Company places its cash and cash equivalents with high quality financial institutions and limits the amount of credit exposure with any one institution. The Company has limited concentrations of credit risk with respect to accounts receivable since 70% of its accounts receivable is due from its joint ventures and officers. At December 31, 2006, the Company has accounts receivable of $2.7 million (2005 – $3 million) due from its joint ventures in Panama and Costa Rica. The Company mitigates credit risk through standard credit and reference checks, but generally does not require collateral to support accounts receivable.